**UNITED STATES of America, Plaintiff,**

v.

**John Phillip McCLARD et al., Defendants.**

**No. LR–71–CR–96.**

United States District Court, E. D. Arkansas, W. D.

Nov. 3, 1971.

160

W. H. Dillahunty, U. S. Atty., Richard M. Pence, Jr., Asst. U. S. Atty., Little Rock, Ark., for plaintiff.

Thomas A. Glaze, Little Rock, Ark., for John Phillip McClard.

M. Drew Bowers, Little Rock, Ark., for Edward William McNeil and Johnnie Lee Tedford.

## MEMORANDUM OPINION

HENLEY, Chief Judge.

Subject criminal case is now before the Court on motions of the defendants to suppress evidence consisting of the fruits of a seizure effected in Saline County, Arkansas, on March 8, 1971, by agents of the Alcohol, Tobacco and Firearms Division of the United States Treasury Department acting under a search warrant issued by a United States Magistrate on March 2, 1971. The materials seized consisted of a 550 gallon unregistered whiskey still, some 3500 gallons of mash, and 133 gallons of whiskey contained in one gallon glass jugs on which whiskey the federal internal revenue taxes imposed by law had not been paid. The defendants have been indicted by the Grand Jury and have pleaded not guilty.

In support of their motions the defendants contend: (1) That there was no probable cause for the issuance of the search warrant. (2) That the warrant was defective in form and content. (3) That there was an unreasonable delay in the execution of the warrant. (4) That in connection with the ultimate execution of the writ the officers violated 18 U.S.C.A., section 3109.

The motions have been submitted on oral testimony, documentary evidence, and thorough memorandum briefs. This opinion incorporates the Court's findings of fact and conclusions of law. There is little dispute about the facts, but it is necessary to state them in some detail.

On March 1, 1971, agents of the Division above mentioned had information that an illicit liquor operation was in progress or about to be undertaken on the Dale Woodall farm in Saline County, and on that date the farm premises were put under observation by agents including Earl R. Hill who has been a federal liquor agent for some 19 years. The improvements on the farm consisted of a house, a barn located some 50 yards from the house, and a stock pond. Some woods were located about 150 yards from the barn. The agents took a position in the woods and examined the house and barn through field glasses. Apparently no one was living in the house at the time.

Mr. Hill, who seems to have been the principal observer, saw a green and white pickup truck driven up to the vicinity of the barn and then backed up to the barn; at about this time a second man appeared; the barn door was open. The two men were observed to remove a number of coca cola cartons from the barn and place them in the truck. Hill's experience has been that such cartons are a convenient means of transporting containers of illicit liquor since each carton will hold four one gallon jugs. The officers saw no still or whiskey in the barn, but just inside the door of the barn they observed what they took to be sugar sacks stacked together; and they saw three butane tanks adjacent to the barn. The officers also observed that a black hose ran from a nearby pond to the barn, and they observed another hose attached to a pump at the side of the house and apparently running into the barn. It does not appear that the officers recognized either of the two men whom they saw on the premises.

On March 2, which fell on Tuesday, Agent Hill prepared on official United States Magistrate forms which had been supplied to him in blank by the Magistrate in Little Rock an affidavit for a search warrant and a search warrant. He took those documents to the Magistrate and executed the affidavit in the Magistrate's presence. The caption of the forms as filled out by Hill was "United States of America vs. John Doe." The Magistrate signed the jurat on the affidavit executed by Hill and also signed the warrant and delivered it to Hill.

The warrant described the Woodall farm in detail and described the property to be searched for and seized, if found, as being an unregistered distillery, its supplies and apparatus, mash fit for distillation, and distilled spirits

on which the tax imposed by law had not been paid. The warrant recited that the items and materials which were to be the subject of the search were fit and intended for use in violation of several of the internal revenue laws of the United States relating to intoxicating liquor.

Although the warrant commanded that it be executed "forthwith," as required by Rule 41(c) of the Federal Rules of Criminal Procedure, it was not executed immediately or until six days later. The reasons for the delay need to be stated.

The officers, of course, were interested not only in seizing and destroying the supposed still, mash, and whiskey but also in arresting the individuals engaged in the violation of the liquor laws of the United States on the Woodall farm. If the individual or individuals involved in the operation were to be arrested and prosecuted successfully, it was desirable and probably from a practical standpoint necessary that he or they be observed working at or around the still if there was one. Thus, further observation of the premises was called for and was contemplated by Agent Hill and his fellows.

On the afternoon of March 2 it began to snow, and the weather became quite bad so that immediate return to the farm was impracticable if not impossible. The snow accumulated on the ground on the farm and elsewhere in the area, and its presence ruled out observation of the premises until it melted since if the officers returned to the vicinity while the ground was still covered with snow and later left without having been able to make a capture, their tracks in the snow would in all probability have been discovered by the operators of the still so that the efforts of the officers would be aborted.

While the snow was probably gone by not later than March 4, the officers working on the case had in the meantime been dispersed on other assignments, and it took some days to get them back together; the problem of reassembly was complicated by the fact that a weekend began on March 6.

On March 8 a number of officers went to the Woodall farm arriving shortly after noon. They took station in the woods and began their observations. They observed activity involving two men around the house and barn, and they noticed that some pigs were in an enclosure near the barn. Later in the afternoon a third individual appeared on the scene and joined in the activities of those already there. The men were seen moving around the barn and carrying out of it buckets of what appeared to be corn or chops; that material was apparently designed to be fed to the hogs that were on the premises, but the officers did not observe any of it actually being fed. At one stage one of the men, who turned out to be the defendant McClard, was observed to place a butane tank in his truck and drive from the barn to the house where he appeared to fill the tank from a larger storage tank and then returned the tank to the barn.

As a matter of tactics the officers did not desire to close in on the operation until all three of the subjects were in the barn at the same time. That situation presented itself about 4:45 P.M., and the officers immediately launched their raid. Two of them went to the house and three of them went to the barn.

Agent Tollison, carrying the warrant, went to the front door and Agent Daniels went to the back door. The testimony is conflicting as to what transpired at the house. Mrs. Tedford, wife of the defendant Tedford, who was in the house, testified that the officers forced both the front and back doors without any prior announcement or identification and that both of the agents had their pistols drawn. Both officers denied that they displayed any weapons, and the Court does not think that they did. Agent Tollison testified that he knocked on the front door, which was unlocked, and that he then opened it and walked inside as Mrs. Tedford was coming to the door, and that he told her he was a federal officer; she did not categorically deny that he so identified him-

self after he was in the house. The back door was secured by a latch, and Agent Daniels used at least some force to get that door open. The search of the house was cursory, and no contraband or evidentiary material was found.

The three other agents, Hill, Paladino, and Williams, ran from the woods to the barn. Williams was the first agent to reach the front of the barn; he saw that the door was ajar and stepped inside observing the defendants and the still in operation. He also saw the mash and the whiskey. He said, "Howdy, boys. What's going on?" What was going on was obvious and was in plain view. By this time the other officers had come up. The defendants were arrested and escorted outside the barn. Shortly thereafter the agents who had been to the house came down to the barn, and the search warrant was formally served.

Taking up, now, the contentions of the defendants, the Court will first consider the attacks on the affidavit for the search warrant and the warrant itself as documents. The Court considers the attacks insubstantial. Defendants complain about the "John Doe" caption of the affidavit and warrant; there might or might not be some substance to that complaint if the warrant had commanded the arrest of an individual or the search of a person; the affidavit did not ask for an arrest warrant or for a warrant to search the person or effects of an individual; and the warrant did not command such an arrest or search. The command of the warrant was for a search of premises described in detail and for the seizure of specifically described contraband items. Defendants complain further that the warrant was not directed to a "civil officer of the United States" as required by Rule 41(c). The basis of that complaint is that the warrant while referring to the officers to whom it was directed as Special Investigators in the "Alcohol, Tobacco and Firearms," did not follow the word last quoted with the words "Division of the United States Treasury Department" or other appropriate identification of the federal law enforcement agency by whom the agents were employed. The absence of complete agency identification was doubtless an oversight, and it did not mislead or prejudice the defendants, and was not calculated to do so. The agents were federal officers, and it is clear when the warrant is considered as a whole that it was addressed to federal agents rather than to State officers or private citizens.

The defendants also complain about the fact that Agent Hill had the affidavit and warrant forms in his possession and filled them out in his own office. Those facts are obviously immaterial in and of themselves. The argument is made, however, that they indicate that the Magistrate did not exercise his own independent judgment in appraising the sufficiency of the affidavit to show probable cause for the issuance of a warrant and perfunctorily granted the request of Agent Hill for the issuance of a warrant. The Court does not accept that argument. There is no evidence whatever that the Magistrate did not give to the affidavit the judicial consideration that he was required to give to it or that he acted as a mere rubber stamp, and the presumption is that he conscientiously performed his judicial function in appraising the affidavit and in determining whether to issue a warrant on the basis of it.

In determining whether the facts set forth in the affidavit established the existence of probable cause for the issuance of the warrant it is important to keep in mind that while the affidavit must establish probable cause, it is not necessary for it to set out facts which establish conclusively or beyond a reasonable doubt that contraband is concealed upon the premises to be searched or that federal law is being violated on such premises. The affidavit is sufficient if it sets out facts sufficient to persuade the Magistrate, acting as a reasonable person, to conclude that probable cause exists for a belief that federal law is being violated on the prem-

ises to be searched. Probable cause to believe that a fact exists is knowledge of facts and circumstances sufficient to cause a person of ordinary prudence acting in good faith to entertain an actual belief, as opposed to mere suspicion, that the fact in question does exist. Spinelli v. United States, 1969, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637; Aguilar v. Texas, 1964, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723; Jones v. United States, 1964, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed. 2d 697; United States v. Long, 8 Cir., 1971, 449 F.2d 288. And where the Magistrate determines from the affidavit before him that there is sufficient cause for the issuance of a warrant, his determination is entitled to great weight. Aguilar v. Texas, supra; Jones v. United States, supra; McCreary v. Sigler, 8 Cir., 1969, 406 F.2d 1264.

■ Actions and things observed by an experienced law enforcement officer may have more significance to him in determining whether the law is being violated at a given time and place than they would have to a layman; and the Court thinks that a Magistrate passing on the question of probable cause in connection with an affidavit for a search warrant presented by an experienced officer has a right to give at least some weight to the officer's presumed expertise.

■ Although, as stated, the officers had advance information that the liquor laws were being violated on the Woodall farm, the affidavit submitted by Agent Hill makes no reference to that information, and his application for the warrant was based solely on his own observations made on March 1, which observations have been described. The affidavit recited those observations and also contained a statement as to Hill's long experience as a liquor enforcement officer and as to the fact that Coca Cola cartons are frequently used as a means of transporting illicit liquor. The Court finds that the affidavit was sufficient, and that the warrant issued on the strength thereof was valid.

It is well known that the making of illicit liquor requires the use of sugar and water, among other things, that stills have to be fired, and that butane gas can be used to fire them. Agent Hill observed at least one source of water on the farm; he observed two water pumps and that hoses were connected to both pumps with one line of hose clearly leading to the barn and the other probably doing so; he also observed what he thought to be stacked sugar sacks; he saw not one but three 100 pound butane tanks; and he saw two men engaged in activities around the barn, the activities including the placing of a number of Coca Cola cartons in the pickup truck that one of the men had backed up to the barn.

The Court is satisfied that the observation of the combination of water, pumps, hoses, sugar sacks, butane tanks, and cartons was fully sufficient to justify a well founded belief in the mind of an experienced law enforcement officer and in the mind of a reasonably prudent United States Magistrate that the barn at least probably contained an illicit still, mash, and moonshine whiskey. Even if it be conceded that Hill's observations were not sufficient to establish probable cause for a search of the house, as opposed to the barn, the answer to that concession is that nothing incriminating was found in the house and none of the evidence that the Court is being asked to suppress was taken from the house.

■ Defendants earnestly contend that the evidence should be suppressed because of the delay in the execution of the warrant. Rule 41(c) stipulates that a search warrant is to be served "forthwith," and Rule 41(d) provides that the warrant must be executed not more than ten days after it is issued. The law in this Circuit is that the extreme time limit for the execution of a search warrant is ten days regardless of circumstances but that officers holding such a warrant are not automatically entitled to delay execution of the warrant until just before the expiration of the ten day period.

Within that period they must act with reasonable diligence to execute the warrant and must do so within a reasonable time not more than ten days after the warrant is issued. What is a "reasonable time" must be determined by reference to the facts and circumstances of each particular case. Spinelli v. United States, supra, 8 Cir., 382 F.2d 871 at 885–886.[1] The Court said (382 F.2d at 885):

"A warrant is a court order requiring the police to perform a ministerial function. They must be allowed certain leeway in the performance of this duty, but likewise they must be required to diligently perform according to the court's demand. A lapse of up to ten days may be reasonable when the delay is caused by distance, traffic conditions, weather, inability to locate the person or premises to be searched, personal safety, etc. However, a delay of a few hours may be unreasonable if the police are not diligent in executing the warrant and purpose of the delay was to prejudice the rights of a suspect.

\* \* \* \* \* \*

" \* \* \* While unreasonable delay cannot be countenanced, still officers must be allowed a certain latitude of action when they are on the delicate and sometimes dangerous mission of executing warrants. \* \* \* "

The delay involved in the Spinelli case was only a little more than two hours. The Court of Appeals found it unnecessary to determine whether that short delay was reasonable or unreasonable in the circumstances since the Court was of the opinion that the delay, even if unreasonable, did not work to the legal prejudice of appellant. The Court stated (p. 886 of 382 F.2d):

" \* \* \* To object to the failure of the police to 'search forthwith' the complaining party must point to some definite legal prejudice attributable to this unjustified delay. The fact that the search uncovered prejudicial evidence does not invest standing unless the presence of the evidence is attributable to the delay. Unjustified attempts by the police to prejudice the suspect by delay in execution do not provide standing unless the police are successful in their efforts. Investigative technics of the police or hypothetical harms invest no standing to suppress evidence seized in an otherwise lawful search."

The Court is actually concerned here with two periods of delay. The basic period began to run when the warrant was issued and ended, at least in a sense, when the officers returned to the Woodall farm on March 8. The second period began at that time and lasted for several hours and until the officers finally made their raid in the late afternoon.

The Court finds that the first period of delay was referable to the bad weather and dispersal of force and in view of those factors was not unreasonable. The Court finds that the second period was referable to the desire of the officers to keep the operation or supposed operation under observation to determine whether additional subjects would appear on the scene and with the end in view of not moving in until the three individuals whom they finally observed should be in the barn at the same time.

The Court finds that the second period of delay, like the first, was reasonable and justified. The officers were not required to act precipitantly. When they commenced their observations only two persons were on the ground. The officers had a right to wait for a reasonable time to see if anyone else would appear, and, in fact, one additional person did appear. Further, the officers had a right in the interest of the successful prosecution of individual defendants to observe in some detail the actions of each of the individuals involved for the purpose of relating them to the illegal activity supposed and believed to be going on inside the barn. The desire of the officers not to move in on the barn

I. Reversed on other grounds, Spinelli v. United States, supra, 393 U.S. 410, 89 S.Ct. 584.

until all three men were inside is quite understandable and was reasonable. The officers were 150 yards from the barn and had to approach it on foot; had such a move been made while one or more of the subjects was outside the barn, the approach of the officers might have been noted by the suspects in time for them or some of them to make their escape by fleeing in different directions. A separation of the defendants in flight, if followed by a dispersal of officers in pursuit, might have led to one to one confrontations which might substantially have increased the likelihood of resistance to arrest.

The language of the Court of Appeals in *Spinelli,* last quoted by the Court, indicates that a delay in the execution of a search warrant is impermissibly prejudicial to a defendant where the presence of contraband or incriminating evidence on the premises at the time of the execution of the warrant is due to the fact that the warrant was not served expeditiously. In other words, if a prompt search would have disclosed nothing incriminating, and if during an unreasonable delay period the defendant brings incriminating evidence into or onto the premises which is seized as a result of the delayed search, the defendant has sustained legal prejudice.

 Since the Court has found that the two periods of delay here involved were not unreasonable, it is really unnecessary for the Court to consider the question of "prejudice" in the *Spinelli* sense of the term.[2] However, the Court finds that the defendants were not prejudiced in that sense. The still was certainly in the barn on March 8, along with the mash and whiskey, and there is nothing to suggest that the still was brought into the barn between March 1 and March 8. It was in the barn on March 1 and it stayed there. Moreover, it is clearly inferable that at least some of the contraband material, other than the still, was in the barn when the warrant was issued although it may well have been changed in form between the time of the issuance of the warrant and the time of its execution.

It is true, of course, that had the officers undertaken to execute the warrant prior to March 8 they might not have been able to make any arrests, and if they had executed the warrant immediately upon arriving at the farm on March 8, they would not have caught the defendant McNeil. But none of the defendants have any right to complain simply because they were on the scene to be arrested when the officers finally executed the warrant. If probable cause existed for the issuance of the warrant, and if it continued to exist after the warrant was issued, a defendant is not prejudiced by a delay in execution merely because he might not have been present and subject to arrest had the warrant been executed at an earlier date or earlier hour; nor is it material in such circumstances that the purpose of the officers in delaying execution was to capture the offender or offenders on the premises. United States v. Nepstead, 9 Cir., 1970, 424 F.2d 269; United States v. Dunnings, 2 Cir., 1969, 425 F.2d 836.

Section 3109 of Title 18, U.S.C.A., invoked by the defendants provides that an officer may use force to effect entry into a house if, "after notice of his authority and purpose" admittance is refused. A very substantial body of case law has been built up in connection with the statute and governing principles are well established.

 In circumstances other than exceptional an officer executing a search warrant which involves entry into a house or other building protected by the Fourth Amendment is required to knock and identify himself and his mission; if he is refused admittance, he may force

---

2. As far as delay and prejudice are concerned, this case is the converse of *Spinelli.* In that case the Court found it unnecessary to pass on the reasonableness of the delay because it found no prejudice. Here, the Court has found that the delays were not unreasonable.

his way into the building or dwelling unit. If the officer secures entry by force and without complying with the statutory requirement, evidence seized by him must be suppressed. In terms, the statute is limited in application to searches authorized by warrants, but the conduct required by the statute with respect to searches is also required with respect to warrantless searches. Sabbath v. United States, 1968, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828; Wong Sun v. United States, 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441; Miller v. United States, 1958, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332; United States v. Molkenbur, 8 Cir., 1970, 430 F.2d 563; United States ex rel. Boyance v. Myers, 3 Cir., 1968, 398 F.2d 896; Fullbright v. United States, 10 Cir., 1968, 392 F.2d 432; United States v. Minker, 3 Cir., 1962, 312 F.2d 632; Care v. United States, 10 Cir., 1956, 231 F.2d 22; Hobson v. United States, 8 Cir., 1955, 226 F.2d 890. The statute is to be construed liberally and while it refers to the use of "force," the concept of "force" extends to the opening of a closed but unlocked door. Sabbath v. United States, supra.

█ The "knock and identify" requirement of the statute may be dispensed with in exceptional cases. Sabbath v. United States, supra, 391 U.S. at 591, 88 S.Ct. 1755. The most common exceptional cases are those in which the officers are confronted with "exigent circumstances," United States v. Singleton, 3 Cir., 1971, 439 F.2d 381, United States v. Garcia Mendez, 5 Cir., 1971, 437 F.2d 85, United States v. Harris, C.A.D.C., 1970, 435 F.2d 74, or in which compliance with the requirement would be an idle gesture or superfluous as where the occupant of the premises recognizes the officers and is plainly aware of the purpose of their visit, United States v. Singleton, supra, Wittner v. United States, 5 Cir., 1969, 406 F.2d 1165. Whether the statute has been violated is to be judged in the light of the circumstances of each particular case.

United States v. Mendoza, 5 Cir., 1970, 433 F.2d 891, 895.

█ As stated, the testimony as to what Agents Tollison and Daniels did at the house is somewhat conflicting. It appears that there may have been a minor violation of section 3109, and for present purposes the Court will assume that the statute was violated with respect to the house. But, the Court is convinced that the conduct of Tollison and Daniels at the house did not taint the conduct of the other officers at the barn, and that the latter conduct did not involve any violation of the statute.

The house and barn were entirely separate structures and were a substantial distance apart; nothing was found in the house, and the conduct of Agents Tollison and Daniels at the house did not in any way facilitate the access that the other officers gained to the barn. In such circumstances it would be unreasonable to say that the assumed violation with respect to the gaining of admittance to the house extended to the barn.

█ As far as the barn was concerned, the conduct of the officers thereat did not really amount to a "search" in any proper sense of the term. The door of the barn was ajar and Agent Williams simply went in. As soon as he got inside he saw the defendants and observed what was there and what was going on. The defendants obviously knew that he and his fellows were officers and there was no doubt about why they were there. The actions of the officers at the barn did not involve the use of physical force and were certainly not unreasonable or oppressive.

In the course of the hearing both sides proceeded on the theory that the issues before the Court were limited to the validity of the warrant and its execution. The Government did not try to sustain the seizure on the theory that even if the warrant was invalid or stale, the seizure was justified as having been incident to a lawful warrantless arrest made by officers in whose presence a felony was being committed. However,

in the course of the hearing the possibility that the seizure could be sustained on that alternative theory occurred to the Court, a fact that was brought to the attention of counsel. After the hearing counsel were advised that if they cared to introduce any more evidence bearing on that aspect of the case, an additional hearing would be conducted. Counsel for the defendants indicated that they did not care to put on any more proof; counsel for the Government stated initially that he did want to introduce some more evidence but later changed his mind.

While counsel for the defendants urge that the Court has no right to consider questions not raised by counsel at the hearing, the Court disagrees, and will proceed to consider the alternative theory that has been mentioned although the Court recognizes that such consideration is unnecessary if the Court is correct in its basic holdings that the warrant was valid and was validly executed at least as far as the seizure at the barn is concerned. But the Court also recognizes that the Court of Appeals may not agree with the basic holdings. Hence, consideration of the alternative theory is desirable.

It is well established that an officer may make an arrest without a warrant where a felony is being committed in his presence or where he has reasonable cause to believe that the person arrested has committed a felony. And subject to rather strict limitations which prevail at present under holdings like Chimel v. California, 1969, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, an officer making a lawful arrest may effect a valid warrantless search and seizure incident to the arrest. An officer who sees contraband or evidence in plain view may validly seize it provided that he is rightfully in a position to see the object or material. Harris v. United States, 1968, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067. In Giordenello v. United States, 1958, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503, the defendant had been arrested and had also been searched as an incident to the arrest. The warrant was attacked as having been invalid, but it was upheld by the District Court and by the Court of Appeals. On certiorari the Supreme Court reversed. In the proceedings before the Supreme Court the Government raised the contention that the officer was justified in making the arrest and search incident thereto even in the absence of a warrant. The Supreme Court held that such a contention could not be raised for the first time on appeal but indicated that upon a new trial the Government would be free to urge that the arrest and search were legal without relying on the warrant. 357 U.S. at 488, 78 S.Ct. 1245. See also Hagans v. United States, 5 Cir., 1963, 315 F.2d 67. Here the question has been raised at a pre-trial stage of the case.

The Court will say without elaboration that in view of the information that the officers had on March 1 and in view of what they saw on March 8 plus the fact that prior to the actual raid Agent Hill recognized the defendant McNeil who had been pointed out to him on a previous occasion in Hot Springs by Agent Paladino,[3] the Court is convinced that the officers were justified in arresting the defendants without a warrant, as they in fact did, and to seize the still, mash, and whiskey incident to the arrest.

On this phase of the case able counsel for McNeil and Tedford have cited the Court to Taylor v. United States, 1932, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951; Agnello v. United States, 1925, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145; Gouled v. United States, 1921, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647; United States v. Kind, 2 Cir., 1937, 87 F.2d 315; United States v. Lee, 2 Cir., 1936, 83 F.2d 195. The Court has given careful consideration to those cases but does not consider

---

3. Paladino would have had no occasion to point McNeil out to Hill except in an illicit liquor context.

them to be in point here. It might be pointed out that Gouled v. United States was overruled by Warden v. Hayden, 1967, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782.

An order overruling both motions to suppress is being entered.