UNITED STATES of America

v.

John F. "Duffy" CONLEY, William C. Curtin, Sheila F. Smith, John Francis "Jack" Conley, Thomas "Bud" McGrath, Mark A. Abbott, Thomas Rossi, William Steinhart, Roberta Fleagle, Robin Spratt, Monica C. Kail, William J. Reed, Joanne T. Smith, Kenneth "Ron" Goodwin, Lawrence N. "Neudy" Demino, Sr., Christopher "Chris" Kail, Joseph A. Devita, Frank Garofalo, Thomas D. Ciocco, Michael Sukaly, Phillip M. "Mike" Ferrell, Anestos "Naz" Rodites, and William E. Rusin, Defendants.

Crim. No. 91–178.

United States District Court,
W.D. Pennsylvania.

July 11, 1994.

Frederick W. Thieman, U.S. Atty., James R. Wilson, Asst. U.S. Atty. for W.D. Pennsylvania, William D. Braun, Criminal Div., U.S. Dept. of Justice, Washington, DC, for plaintiff.

James Wymard, William Difenderfer, Anthony Mariani, Ellen Viakley, Gary Gerson, Caroline M. Roberto, Joel Johnston, Stanley Greenfield, Martha Bailor, Ray Radokovich, Carmen Martucci, Lee Markovitz, Edward J. Osterman, William Acker, Foster Stewart, Joseph Kanfoush, Carl Max Janavitz, Raymond M. Maloney, John Goodrich, Gary B. Zimmerman, Vincent Baginski, John Zagari, James Andring, Pittsburgh, PA, for defendants.

## MEMORANDUM OPINION

LEE, District Judge.

Before the Court is the Pretrial Motion of John F. "Duffy" Conley: Motion to Suppress [9/91 search of residence; probable cause; execution]. (Document No. 377, in part). In this motion, Defendant John F. "Duffy" Conley ("Duffy Conley") contends that the executing officers failed to knock and announce their authority and purpose in violation of the federal knock and announce statute, 18 U.S.C. § 3109. He also contends that the supporting affidavit failed to include probable cause to search his residence.

### Execution of the Warrant

### Findings of Fact

1. On September 19, 1991 Special Agent Andrea Dammann of the Federal Bureau of Investigation obtained a search warrant for the premises of 467 Baldwin Road, Robinson Township, Pennsylvania.

2. The premises of 467 Baldwin Road is the residence of Duffy Conley.

3. At 7 a.m. on September 20, 1991, Special Agent Robert Smith ("S.A. Smith") and six other officers of the FBI and IRS executed the warrant on the residence.

4. The federal officers were dressed in FBI "raid jackets."

5. After exiting a car, S.A. Smith and FBI S.A. Craig, who was in charge of the execution of the warrant, approached the residence and observed a driver sitting behind the wheel of a parked car in Defendant's driveway.

6. S.A. Smith walked to the side of the car and directed the driver to "turn off his engine," and the driver complied. S.A. Smith knew the driver was not Duffy Conley. S.A. Smith subsequently learned that the driver was Defendant Frank Garofalo.

7. Although he had observed Defendant Garofalo sitting in a parked car in the driveway with the engine running, S.A. Smith did not know whether Defendant Garofalo had just delivered or was awaiting Duffy Conley. It appeared to S.A. Smith that Defendant Garofalo had just arrived at Duffy Conley's residence.

8. S.A. Smith did not announce to Defendant Garofalo that he was an FBI agent.

9. IRS S.A. Daniel Hanlon, who had previously met Defendant Garofalo, stopped briefly to say hello to and shake the hand of Defendant Garofalo.

10. Eventually, Defendant Garofalo was removed from his vehicle and interviewed by FBI Special Agent Pietropola.

11. S.A. Smith led the way to the residence, observed only one entrance and approached the front door by walking up a set of stairs to a large porch. The front door was a standard-sized, wooden door with a small, unobstructed glass window about eye-level. S.A. Smith looked through the window and could see a small hallway and a wall through the window, and nothing else.

12. S.A. Smith rang the doorbell and knocked on the door.

13. S.A. Hanlon and S.A. Craig joined S.A. Smith near the front door. S.A. Hanlon was behind and to the right of S.A. Smith. S.A. Craig was to the left of S.A. Smith, barely on the porch or on one of the steps leading to the porch.

14. After about 10 to 15 seconds, no one had answered the door. S.A. Smith rang the doorbell and knocked on the door again.

15. S.A. Hanlon then saw a flash, "a—like if you had turned on a light bulb and the light bulb had surged and went out."

16. At this point in time, S.A. Smith heard "ripping and crumbling of paper" but could not determine from where in the house the sound was emanating.

17. Agent Hanlon heard a "someone in a hurried movement, like a—a vibrating type of sound when somebody moves that hear when you're in another room."

18. While S.A. Hanlon was looking through the door window, he saw a second flash. Having seen the second flash, S.A. Hanlon did not believe that it was a light bulb.

19. S.A. Hanlon exclaimed, "He's burning something."

20. At the same time, S.A. Craig, who was in front of window to the left of the front door observed Duffy Conley through the window burning something.

21. S.A. Craig told S.A. Smith to "hit the door."

22. S.A. Smith hit the door with his shoulder twice, forcibly opening it on the second attempt.

23. S.A. Smith ran through the door. He was across the threshold when he shouted "FBI, we have a search warrant." By the time he finished the word "warrant," he had run down the short hallway and turned to the left towards a living room area.

24. Upon arriving in the living room, S.A. Smith found Duffy Conley near the fireplace in "a crouched position, holding some papers, with other papers burning in the fireplace."

25. S.A. Smith approached Duffy Conley and just before S.A. Smith got to him, Duffy Conley threw the last piece of paper in his hand into the fire.

26. S.A. Hanlon followed S.A. Smith into the living room and when S.A. Hanlon first saw Duffy Conley, he was turning from the fireplace. S.A. Hanlon ordered Duffy Conley to sit away from the fireplace, and Duffy Conley complied.

27. S.A. Smith attempted to retrieve the burning paper but was unable to do so before it was burned beyond recognition. The only fuel for the fire in Duffy Conley's fireplace was burning papers.

28. During the hours of the search, the agents discovered that Duffy Conley's house was equipped with a motion detector, which was aimed at the driveway and went off whenever there was movement in the driveway.

### Discussion

■ The Court concludes that although the agents did not strictly comply with Section 3109, under the circumstances compliance was excused.

Title 18, Section 3109 provides:

**§ 3109. Breaking doors or windows for entry or exit**

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

18 U.S.C. § 3109 (1994). Failure to comply with the federal statute results in the application of the exclusionary rule to the fruits of the entry. *United States v. Marts*, 986 F.2d 1216, 1218 (8th Cir.1993); *United States v. Nolan*, 718 F.2d 589, 596 (3d Cir.1983); *see also Sabbath v. United States*, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968).

In this case, the officers did not comply with the statute. At no time prior to forcibly breaking open the door did the officers give notice of their authority and purpose. S.A. Smith announced "FBI, we have a search warrant" only after breaking open the door and crossing the threshold. In *United States v. Augello*, 368 F.2d 692, 693–95 (3d Cir. 1966), *vacated on other grounds sub nom., DeCesare v. United States*, 390 U.S. 200, 88 S.Ct. 900, 19 L.Ed.2d 1036 (1968) federal officers approached a locked screen door and knocked and announced *both* their authority and purpose, stating " 'Federal Officers with a search warrant. Open the door.' " *Id.* at 693. The defendant's sister then was observed running away from the door calling

the defendant's name. *Id.* The court framed its inquiry as follows:

> [W]e are concerned with three statutory requirements: (1) announcement of authority, (2) announcement of purpose, and (3) refusal of admittance. Since the District Court's specific finding that the first two announcements were made, may not be disturbed, it remains only to consider whether the officers were 'refused admittance.' Such refusal is present where it can reasonably be inferred from the actions or inaction of the occupants of the premises to be searched.

*Id.* at 694. In contrast, the agents in this case made no announcement of their authority or purpose prior to breaking open the door of Duffy Conley's residence. The agents only knocked on the door and rang the bell. The Court therefore rejects the Government's attempt to prove *compliance* with the statute under the constructive refusal doctrine. *Cf. United States v. Kane,* 637 F.2d 974, 977 (3d Cir.1981) ("The government concedes, as it must, that Section 3109 applies to the search and that the announcement requirement of the statute was not met").[1]

■ The announcement requirement, however, is not without exception. *United States v. Singleton,* 439 F.2d 381, 385 (3d Cir.1971). Recognizing the common law roots of the statute, courts have not hesitated to graft exceptions onto the statutory language. *See, e.g., United States v. Stiver,* 9 F.3d 298, 301–02 (3d Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1115, 127 L.Ed.2d 425 (1994); *Kane,* 637 F.2d at 977–79; *United States v. Davis,* 461 F.2d 1026, 1034 (3d Cir.1972). Regarding the respective burdens on the government and defendants regarding proof of exceptions, the Court of Appeals for the Third Circuit has held:

> We still must consider whether the police officers in this case had reasonable grounds for such belief [that circumstances warranted an exception to the statutory requirements]. The reasonableness of their belief must be evaluated, of course,

according to the facts "as the officers had reason to believe (them to be) *at the time of their entry.*" *Ker v. California,* 374 U.S. [23] at 40 n. 12, 83 S.Ct. at [1623] 1633 n. 12 [10 L.Ed.2d 726 (1963) ] (emphasis in original). *Accord, United States v. Davis,* 461 F.2d at 1034. The defendant has the burden of establishing a prima facie violation of the statute. *See United States v. Gardner,* 553 F.2d 946, 949 (5th Cir.1977), *cert. denied,* 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 753 (1978). Once this minimal burden has been met, however, as it has in this case, we conclude that "the burden of proof of exigent circumstances to justify such a deviation from the Fourth Amendment is upon those who are seeking advantage of the exception," *United States v. Murrie,* 534 F.2d [695] at 698 [6th Cir. 1976] that is, the government. *Accord, United States v. Gardner,* 553 F.2d at 949.

*Kane,* 637 F.2d at 979. In the present case, the Government seeks to invoke the common law exception recently applied in *Stiver.*

In *Stiver,* the court analyzed the officers' conduct, which was held to be subject to challenge only under the 4th Amendment, under the common law rule embodied in Section 3109 as part of the 4th Amendment "reasonableness" inquiry. The court stated:

> In light of the overlap between the common law rule and the Fourth Amendment, we begin our analysis of the question presented in this case by noting that the officers' conduct complied with the common law rule. Under that rule, an officer executing a warrant could enter without waiting to be admitted "where those within, made aware of the presence of someone outside (because, for example, there has been a knock at the door), are then engaged in activity which justifies the officers in the belief that an escape or the destruction of evidence is being attempted." *United States v. Kane,* 637 F.2d 974, 978 (3d Cir.1981) (quoting *Ker v. California,* 374 U.S. 23, 47, 83 S.Ct. 1623, 1636, 10 L.Ed.2d 726 (1963) (Brennan, J., concurring and dissenting)). *See also Nolan,* 718

---

1. The Government cites *United States v. Singleton,* 439 F.2d 381 (3d Cir.1971) as an example of a constructive refusal case. This Court reads *Singleton* as a case *excusing* compliance with the statute under a judicially created exigent circumstances exception.

F.2d at 596; *United States v. Davis*, 461 F.2d 1026, 1034 (3d Cir.1972). Here, the officers had a strong basis for believing that the defendant was involved in the drug trade and that drugs or other evidence could be readily destroyed if entry was delayed. When they announced their presence, they heard heavy and hurried footsteps leading away from the door. Under these circumstances, the officers did not violate the common law rule by entering without waiting for someone to open the door. *See, e.g., United States v. Bonner*, 874 F.2d 822, 824 (D.C.Cir.1989); *United States v. Allende*, 486 F.2d 1351, 1353 (9th Cir.1973), *cert. denied*, 416 U.S. 958, 94 S.Ct. 1973, 40 L.Ed.2d 308 (1974); *United States v. DeLutis*, 722 F.2d 902, 909 (1st Cir.1983).

*Stiver*, 9 F.3d at 302. The Court agrees with the Government that the officers had reasonable grounds to believe that Duffy Conley was aware of their presence, authority and purpose and was attempting to destroy evidence.

S.A. Smith knocked and rang the doorbell twice. In the twenty to thirty seconds that elapsed between the first knock and the breaking of the door, the agents heard rapid movement inside and the tearing and crumbling of paper. S.A. Hanlon saw the first flash, which he did not recognize as the burning of paper. After the second flash, he did recognize what was occurring inside. At almost exactly the same point S.A. Craig saw Duffy Conley through the window burning something and gave the order to "hit the door." At that point, the agents had reasonable grounds to believe that Duffy Conley knew of their presence and purpose and was refusing to admit them while evidence was being destroyed. The agents had reasonable grounds to believe that further waiting or announcing their authority and purpose would be a useless gesture. *Accord Id.; Singleton*, 439 F.2d at 385–86. Under these circumstances, compliance with Section 3109 was excused.

### Probable Cause to Search

### Findings of Fact

1. The search warrant described the structure to be searched and authorized the seizure of the following items:

(a) Any and all monies realized from the operation of the video poker machines and any and all containers for said coins and currency.

(b) Any and all gambling paraphernalia and records including but not limited to: names and addresses of the owners, users, routemen, collectors, movers, solicitors, salespersons, servicemen, distributors, and manufacturers relating to the video poker machines; contracts setting forth agreements between vendors and the establishment for video poker machines; documents, ledgers, books regarding the machine usage, number of plays, amounts deposited in the machines, amounts of payoffs to winners, percentage and income earned by vendor and establishment from video poker machines.

(c) Any and all business records reflecting banking transactions, canceled checks, purchase and sales orders, invoices, shipping and receiving receipts; and invoices relating to Sheila Smith, Sheila Kelly, Duffy Conley, Duffy's Vending, Three Rivers Coin, Matrix, Premier Enterprises, T.D. Amusements, Chartiers Vending and S & M Vending from 1986 to the present.

(d) Any and all documents relating to loans and/or other financial transactions between vendor and establishment.

(e) Electronic data processing and storage devices, computers and computer systems including central processing units; internal and peripheral storage devices such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices or other memory storage devices; peripheral input/output devices such as keyboards, printers, video display monitors, optical readers, and related communications devices such as modems; together with system documentation, operating logs and documentation, software and instruction manuals.

All of the above records, whether stored on paper, on magnetic media such as tape, cassette, disk, diskette or on memory storage devices such as optical disks, pro-

grammable instruments such as telephones, "electronic address books", calculators, or any other storage media, together with indicia of use, ownership, possession, or control of such records.

All of which constitute fruits, instrumentalities and evidence of the offense of operating an illegal gambling business, in violation of Title 18, United States Code, Sections 2 and 1955.

Warrant, at 1–2.

2. In the affidavit of probable cause,[2] Agent Dammann states the following regarding her sources of information:

2. I am knowledgeable of the facts set forth herein as a result of my involvement in the Duffy Conley investigation, including my interviews of witnesses; discussions with other special agents of the FBI and IRS; review of statements given by witnesses to other law enforcement officers in this investigation; review of grand jury transcripts and memoranda of interviews of several witnesses; review of documents gathered during the course of this investigation; and my own observations and surveillance during the course of this investigation.

3. The Baldwin Road affidavit quotes 18 U.S.C. § 1955, the prohibition of illegal gambling businesses.

4. Stating that it was a description of an illegal *per se* video poker machine under Pennsylvania law, the Baldwin Road affidavit included the following quote from *United States v. 294 Various Gambling Devices*, 718 F.Supp. 1236 (W.D.Pa.1989) (Weber, J.):

The machine displays the time honored ranking of poker hands and the number of points the machine will award for the listed hands. The ranking of hands is grounded in laws of statistical probability, and the video poker machine awards points based on this scale, although it does not award true odds. The higher rank of the hand, the higher the amount of points awarded.

Upon insertion of a quarter, the machine displays five cards on a video screen. These five cards are randomly selected by the machine from an ordinary deck of 52 cards in four suits. In an effort to improve the hand dealt to him, the player may then "discard" any of the five original cards by pressing the appropriate buttons on the machine. The machine then displays new cards to replace the ones discarded. The machine automatically evaluates this final array of five cards, ranks it as a poker hand, and awards points as indicated above.

This in all its simplicity is the sum total of the game of video poker.

Up to now we have employed the term "points" to describe the units awarded to the player by the machine for winning poker hands. No matter whether an individual machine labels it "score," credits, or "games," each point entitles the player to one free play of the machine. Each play of the game has one object: the accumulation of additional free games, and these free games may be accumulated from game to game so that, with a run of luck, a player may accumulate a significant number of free games.

When a machine is used as a gambling device, these free games are converted to cash by a bartender or owner of the establishment that houses the machine. A successful player in such an establishment is paid a quarter for each "credit" accumulated on the machine. The bartender or owner, having verified the number of credits and paid the player, then removes or "knocks off" the player's accumulated credits, returning the machine to zero credits to await the next player's coins.

Baldwin Road affidavit, at 3–4, ¶ 6.

5. The Baldwin Road affidavit indicates that a Cooperating Witness ("C.W.") was granted immunity on April 24, 1991, has provided information to law enforcement officers and prosecutors approximately five times since April 9, 1991 and has testified before the federal grand jury in this case. The Baldwin Road affidavit indicates that C.W.

---

**2.** Special Agent Dammann was the affiant on a number of different affidavits in the fall of 1991. The Court, therefore, will reference the affidavits by the location to be searched. Hence, the affidavit under discussion in this opinion will be termed the "Baldwin Road affidavit."

was represented by counsel at each of his meetings with government representatives.

6. The Baldwin Road affidavit states that C.W. has known Duffy Conley and worked for his business from November, 1986 until the (then) present time, C.W. has no criminal record and the information provided by C.W. in this case has proven to be truthful and accurate in every instance where the FBI and IRS attempted to verify it.

7. Paragraph 4(a)–(p) of the Baldwin Road affidavit details the information C.W. furnished to law enforcement officials and prosecutors. Paragraphs 8 through 15 this Opinion correspond to paragraph 4(a)–(p) of the Baldwin Road affidavit.

8. C.W. was hired in November, 1986 by Duffy Conley and Duffy's Vending, also known as Three Rivers Coin, which at that time was located at Third Avenue and Third Street, Carnegie, Pennsylvania and at Conley Motor Freight, 930 Saw Mill Run Boulevard, Pittsburgh, Pennsylvania.

9. After his first month of employment, C.W. began repairing video poker machines owned by Duffy's Vending, which were in place at various business establishments and private clubs in the Western District of Pennsylvania. These machines were operationally equivalent to the illegal machines described in *294 Various Gambling Devices.* Although there were "on paper" changes to the structure of Duffy Conley's illegal gambling business, C.W. continues to work for Duffy in substantially the same capacity at the present time.

10. From November 1986 to January 1990 Duffy Conley's video poker machine business operated as follows:

Duffy Conley was the owner and operator of Duffy's Vending. Duffy's Vending owned both legitimate vending machines and games as well as video poker machines throughout the Western District of Pennsylvania. During that time period, C.W. observed Duffy Conley acting as collector, emptying money from the video poker machines at certain locations. C.W. also observed Duffy Conley splitting money with the owners of several of the locations where the video poker machines were lo-

cated. Duffy Conley's role in this organization was also made clear to C.W. when C.W. attended and participated in several business meetings of the employees of Duffy's Vending in 1988. In fact, at one of these meetings, an organization chart was provided to the employees in attendance. In addition to Duffy Conley, the management of Duffy's Vending from November of 1986 to January of 1990 consisted of Bill Curtin, who was in charge of "tech" people (repairmen) and movers; Sheila Smith, who was in charge of bookkeeping and dispatching service calls; and Michelle Farer, who was in charge of the collectors.

Baldwin Road affidavit, 6–7, ¶ 4(c)

11. In addition to C.W., four Tech people and three movers worked out of the Third Avenue and Third Street address, responding to service requests relayed to them by Sheila Smith, a.k.a. Sheila Kelly, and John Francis "Jack" Conley. Sheila Smith and Jack Conley relayed these service calls from the Conley Motor Freight premises.

12. In the summer of 1988 the tech people and movers relocated their base of operations from the Third Avenue location to a building located at 3105 Windgap Avenue, Ingram, Pennsylvania, in order to accommodate the approximate doubling of locations in which Duffy's Vending had video poker machines, from 150 in 1986 to about 300 in 1988.

13. Throughout this time-period, employees of Duffy's Vending received wages by paycheck. C.W. was also reimbursed in cash for expenses, and, in addition, C.W. and certain other employees received a weekly bonus based upon performance. This bonus was paid in small bills in a sealed envelope, and unlike the paycheck, never had taxes deducted from it by Duffy's Vending.

14. In December, 1989, the Windgap Avenue location was raided by federal agents and U.S. Marshals. Approximately two weeks later, Duffy Conley began to reorganize his video poker machine business. Four new companies were created—Matrix, Chartiers Vending, T.D. Amusements, and S & M Vending. They were still operating at the time of the Baldwin Road affidavit.

**894**

15. Subparagraphs 4(h–p) of the Baldwin Road affidavit details the reorganization and subsequent operation of the gambling business:

(h) The reorganization began as follows: In approximately January, 1990, Duffy Conley asked C.W. if C.W. would be interested in forming and operating a service company which would do service work for three vending companies. This new company would be formed with financial support and at the direction of Duffy Conley. After C.W. informed Duffy Conley that he would be interested in such a proposition, Duffy Conley told C.W. to choose two tech people to work for him. Duffy Conley further instructed C.W. to get a tax I.D. number for this new business. Duffy Conley provided money to C.W. to open a bank account for the business, provided a building in C.W.'s name to be used as the location for the business, and provided C.W. with start up money. Duffy Conley and C.W. agreed that the new company would be named "Matrix". A fictitious name registration was accomplished for Matrix and C.W. was registered as the owner and operator of Matrix. The building which was provided by Duffy Conley for Matrix was located at 324 Helen Street, McKees Rocks. This building had been owned by Duffy Conley but was placed in C.W.'s name for use by Matrix.

(i) Matrix was to service three vending companies exclusively. C.W. later learned that these three vending companies—Chartiers Vending, T.D. Amusements, and S & M Vending—were recently formed businesses in the names of Rick Reed, Tom Ciocco and Phillip M. "Mike" Ferrell, respectively. Reed, Ciocco, and Ferrell, like C.W., had merely been employees of Duffy's Vending prior to January of 1990. Specifically, Ciocco and Ferrell had been collectors for Duffy's Vending, Reed had been a mover, and C.W. had been a tech person. However, through the funding and instruction of Duffy Conley, these three individuals, along with C.W., were now the owners of new businesses.

(j) After Rick Reed, Tom Ciocco and Mike Ferrell were registered as the owners of the three businesses named above,

the owners of the various video poker machine locations were led to believe that the video poker machines were owned by those companies and not Duffy's Vending or Three Rivers Coin. As of January of 1990, Duffy Conley wanted it to appear that he was connected only with "legitimate" (not video poker) vending machines and games. Despite the creation of the three new vending companies and the apparent "transfer" of control and/or ownership of the video poker machines, Duffy Conley to this date remains in charge of an ever-expanding network of video poker machine locations, including those that appear to be owned by the newly created vending companies, just as he remains in charge of Matrix's maintenance of those machines. The reorganization was merely a paper transaction, with all of the persons involved still performing essentially the same duties as they did prior to the creation of those businesses in January of 1990. The purpose of the reorganization was simply an attempt to remove Duffy Conley's name from the video poker machine business. Since the reorganization, the gambling operation involving the video poker machines operates as follows:

(1) The video poker machines were divided among Chartiers Vending, T.D. Amusements and S & M Vending. These three companies, through Reed, Ciocco and Ferrell, collect proceeds from their video poker machines at the various locations, just as they did when they were formal employees of Duffy's Vending. All three of these companies pay Matrix a monthly retainer as directed by Duffy Conley to cover Matrix's expenses in accomplishing the repairs of the video poker machines at the locations. Reed, Ciocco and Ferrell received Matrix business cards to distribute at the various locations so that when those locations experience problems with their video poker machines, they could call Matrix directly. After collecting money from the various locations, Chartiers Vending, T.D. Amusements and S & M Vending dispose of the money in accordance with Sheila Smith's directions. The sole purpose of Chartiers Vending, T.D.

Amusements and S & M Vending is to maintain a network of video poker machines and collect the proceeds thereof for Duffy Conley.

(2) Matrix began operating on January 15, 1990, and for the first two weeks, Matrix serviced both the video poker machines for the three companies as well as the legitimate vending machines and games owned by Duffy's Vending/Three Rivers Coin. From February 1, 1990 up to and including the present, however, Matrix services only video poker machines, primarily those of Chartiers Vending, T.D. Amusements and S & M Vending. These machines are used as illegal gambling devices as described by the late Judge Weber. Matrix no longer has anything to do with the legitimate vending machines and games owned by Three Rivers Coin. This separation of service was done at the direction of Duffy Conley and Bill Curtin. As a result of this separation, when a location is experiencing problems with both a legitimate vending game and a video poker machine, a tech person employed by Duffy's Vending/Three Rivers Coin will go to that location to service the legitimate machine and a Matrix tech person will go to service the video poker machine.

(3) Matrix has nine employees, including C.W. These employees' paychecks are drawn on the Matrix bank account which was opened when Matrix was formed. Matrix receives $4,000 per month from Chartiers Vending; $5,000 per month from T.D. Amusements; $4,000 per month from S & M; and approximately $1,100 per month from two other individuals who operate video poker machines not in the name of either Chartiers Vending, T.D. Amusements or S & M Vending. These amounts are not related to the number of services performed by Matrix on the video poker machines. Rather, Duffy Conley determines how much is to be paid by these five sources to Matrix, and this is the only source of income for Matrix. Matrix exists only to service video poker machines and does not attempt to make a profit but rather uses all funds received to pay wages and expenses.

(k) Since Matrix was formed in January of 1990, C.W. meets with Duffy Conley every Friday at Duffy Conley's residence. At these meetings, C.W. and Duffy Conley discuss the operation of Matrix and C.W. picks up sealed cash envelopes for the employees of Matrix.

(l) In approximately January of 1990, Sheila Smith's job, unlike the jobs of C.W., Reed, Ciocco and Ferrell, changed. As set forth above, dispatching was no longer being used for service calls. Instead, Matrix was receiving the service calls directly. Sheila Smith's new role in the organization was to be the owner and operator of a new business called "Premier Enterprises." Sheila Smith is the only known employee of Premier Enterprises. The function of Premier Enterprises was and is to oversee the three vending companies referenced above, i.e., Premier Enterprises through Sheila Smith, is in charge of collections. Rick Reed has informed C.W. that he (Reed) cannot issue a monthly check to Matrix until Sheila Smith authorizes Reed to do so.

(m) In addition, Sheila Smith still occasionally talks to C.W. regarding the movement and installation of new video poker machines. Although C.W. gives Sheila Smith advice regarding new locations, Sheila Smith makes the ultimate decision regarding the installation, replacement, addition and removal of video poker machines at the various locations. When C.W. talks to Sheila Smith, he calls her at home or on her beeper. Her home telephone number is (412) 221–1579. C.W. recalls Sheila Smith using the name "Premier Enterprises" during a conversation between C.W. and Sheila Smith regarding the payment of Matrix's bills. C.W. last contacted Sheila Smith at her home phone number approximately two weeks ago regarding video poker machines. Although C.W. cannot recall exactly what was discussed during that telephone conversation, C.W. is certain that it was related to video poker machines and feels that it probably dealt with the security of certain video poker machines and/or locations.

(n) Since Matrix was formed in January of 1990, C.W. meets with Duffy Conley

every Friday at Duffy Conley's residence. At these meetings, C.W. and Duffy Conley discuss the operation of Matrix and C.W. picks up sealed cash envelopes for the employees of Matrix. At one of these meetings, C.W. observed Duffy Conley wrap cash and store it in his microwave.

(o) C.W. also went to Duffy Conley's residence in December of 1990 to pick up champagne provided by Duffy Conley for Matrix's employee Christmas party.

(p) While at Duffy Conley's residence on Fridays, C.W. has seen two other individuals come to see Duffy Conley.

(i) C.W. has seen Bill Rusin, who owns and operates two bars called "Cruisin II" and "Mugshots." C.W. has serviced video poker machines at both of these locations. C.W. also states that Bill Rusin has run errands for Matrix at Duffy Conley's direction.

(ii) C.W. has also seen Roberta Fleagle come to Duffy Conley's house on a Friday. Since 1986, Fleagle has operated "Terry's Snack Shop" and "The Magazine Shop," which are across the street from each other in McKees Rocks. C.W. states that he has been to both of these locations numerous times to service video poker machines.

Baldwin Road affidavit, at 9–15, ¶¶ 4(h–p).

16. In addition to the information that C.W. furnished to law enforcement personnel, the Baldwin Road affidavit, at page 15, paragraph 4(a–i) [sic], summarizes materials retrieved in a September 10, 1991 examination of garbage from the curb of 1352 Pesavento Drive, which is the address of Sheila Smith according to C.W. Examination of the garbage revealed the following papers and documents:

(a) Four "Collection's Record" documents, dated 8/12/91, 8/14/91, 8/26/91, and 8/28/91, which reflect collections from video poker machines.

(b) Scrap of paper with handwritten note "Machines in error Roma 19 Peanuts."

(c) Envelope addressed to "Three Rivers Coin" and "Attn: Sheila Smith", postmarked September 7, 1991.

(d) Envelope addressed to "Three River [sic] Coin 3105 Windgap Avenue, Pittsburgh, PA 15205", postmarked September 6, 1991.

(e) Explanation of medical benefits from Security Life Insurance Company, which contains an address of the recipient as follows:

Sheila F. Kelly
Duffy's Vending
930 Saw Mill Run Boulevard
Pittsburgh, PA 15220

(f) Two return item cash letters addressed to "Duffy's Vending 930 saw Mill Run boulevard, Pittsburgh, PA 15220–53–8" from Pittsburgh National Bank, dated 09/04/91.

(g) Scrap of form document containing the words "Records of Earnings or Payments" and "Duffy's Vending."

(h) Four other documents addressed to either Duffy's Vending or Three Rivers Coin.

(i) Several pieces of mail addressed to Sheila Kelly and Sheila Smith.

Baldwin Road affidavit, at 15–16.

17. The Baldwin Road affidavit avers that in July, 1990 the FBI raided several business establishments and clubs in the Western District of Pennsylvania, including Matrix, and seized over 60 video poker machines. C.W. confirmed that most of the video poker machines seized during these raids were owned by Duffy Conley and used in his illegal gambling business.

18. The Baldwin Road affidavit avers that Special Agent Charles Duffy examined the video poker machines seized during the July, 1990 raids and determined them to be operationally equivalent to the illegal machines described by Judge Weber in *United States v. 294 Various Gambling Devices*. The only difference between the machines described by Judge Weber and the machines seized in July, 1990 was that most of the seized machines were equipped to receive $1, $5, $10 and $20 bills rather than quarters.

19. The Baldwin Road affidavit avers that independent investigation confirmed that Chartiers Vending is a sole proprietorship

registered in the Pennsylvania Corporation Bureau's Fictitious Name Index in the name of Richard Reed.

20. The Baldwin Road affidavit avers that independent investigation confirmed that T.D. Amusements is a sole proprietorship registered in the Pennsylvania Corporation Bureau's Fictitious Name Index in the name of Thomas D. Clocco [sic].

21. The Baldwin Road affidavit avers that independent investigation confirmed that S & M Vending is a sole proprietorship registered in the Pennsylvania Corporation Bureau's Fictitious Name Index in the name of Phillip M. Ferrell.

22. The Baldwin Road affidavit avers that the property located at 324 Helen Street, McKees Rocks, PA, which is the address of Matrix, is listed in the deeds registration records of Allegheny County in the name of C.W. in or about January of 1990.

23. In addition to information from C.W., the Baldwin Road affidavit includes information from an additional cooperating witness, C.W.–1, and a confidential informant, C.I. Paragraphs 8 through 19 of the Baldwin Road affidavit state:

8. A second cooperating witness (hereinafter C.W.–1) has also met with and provided information to law enforcement officers and prosecutors approximately five times since August 21, 1990.

9. C.W.–1 has known Duffy Conley approximately four and one half years. during that time period, C.W.–1 has operated a business which sells video poker machines. From 1987 to approximately September 1989, C.W.–1 sold Duffy Conley several hundred video poker machines. C.W.–1 describes the operation of these video poker machines as being virtually identical to the illegal video poker machines described by Judge Weber.

10. C.W.–1's criminal record consists of one conviction in 1988 under Pennsylvania law for selling illegal video poker machines. The information provided by C.W.–1 in this case has proven accurate in each instance where the FBI and IRS have attempted to verify it.

11. In or about September of 1989, C.W.–1 quit selling the video poker machines to Duffy Conley as a result of his conviction for selling illegal video poker machines and the above-referenced Judge Weber decision.

12. C.W.–1 further states that he knows that Duffy Conley is still dealing in video poker machines. C.W.–1 knows of a restaurant called "Snickers" which still has two of Duffy Conley's video poker machines. C.W.–1 knows that Duffy Conley also still has poker machines at the [sic] "The Cozy Kitchen." In June or July of 1991 C.W.–1 was at the Cozy Kitchen and observed a sign which promised a new car for a Royal Flush.

13. C.W.–1 states that although he has never heard of either T.D. Amusements or S & M Vending, he does know the name Chartiers Vending. C.W.–1 knows Chartiers Vending to be one of Duffy Conley's companies. C.W.–1 states that he knows this because Rick Reed recently purchased a hydraulic lift for a pickup truck in the name of Chartiers Vending. Because C.W.–1 knows Rick Reed to be a former employee of Duffy's Vending he believes Chartiers Vending is just another company used by Duffy Conley to conduct his video poker machine business. Another reason that C.W.–1 believes that Rick Reed is Working for Duffy Conley is because Duffy Conley has paid for bill acceptors which C.W.–1 has sold to Rick Reed.

14. C.W.–1 still occasionally deals with a company called Matrix for the sale of parts. His last transaction with Matrix was in approximately May or June of 1991.

15. Even though C.W.–1 no longer provides video poker machines to Duffy Conley, he still sells "legitimate" vending machines and games to Duffy Conley. On one occasion, Bill Rusin gave C.W.–1 $21,000 in cash wrapped in foil and plastic as payment for "legitimate" items purchases by Duffy Conley.

16. When C.W.–1 has to contact Duffy Conley, he calls Duffy Conley at his residence on Friday mornings. C.W.–1 states that Duffy Conley works out of his home on Friday mornings. He has called Duffy

Conley at home on a Friday at least once since July of 1991.

17. A confidential informant (hereinafter "C.I.") has also provided information to the FBI concerning Duffy Conley's video poker machine business. C.I. has consistently proven truthful in providing information to the FBI in several other criminal investigations.

18. C.I. has been inside Duffy Conley's residence with Duffy Conley. While at Duffy Conley's residence, C.I. has observed Duffy Conley conducting his video poker machine business. C.I. observed this activity in approximately April or May of 1991.

19. C.I. has taken Special Agents of the FBI to Duffy Conley's residence and it is the same residence which is described in paragraph 4 on page 2 of this affidavit.

Baldwin Road affidavit, at 18–21.

24. Based upon the foregoing information, the affiant asserts that probable cause to believe that at 467 Baldwin Road the items listed in the *capias* clauses of the warrant will be found.

### B. Discussion

Duffy Conley contends that the Baldwin Road affidavit failed to provide probable cause to search his residence.

■ The standard of review to be employed in reviewing a search warrant is clear:

"[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." [*Illinois*] *v. Gates*, 462 U.S. at [213] 238, 103 S.Ct. at [2317] 2332 [76 L.Ed.2d 527 (1983) ] (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). Keeping in mind that the task of the issuing magistrate is simply to determine whether there is a "fair probability that contraband or evidence of a crime will be found in a particular place," id., a reviewing court is to uphold the warrant as long as there is a substantial basis for a fair probability that evidence will be found.

*United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir.1993), *cert. denied*, ─ U.S. ─, 114

S.Ct. 1218, 127 L.Ed.2d 564 (1994). A judicial officer is entitled to draw reasonable inferences about where evidence is likely to be found, based upon the nature of the crime and the evidence sought. *United States v. Malin*, 908 F.2d 163, 166 (7th Cir.), *cert. denied*, 498 U.S. 991, 111 S.Ct. 534, 112 L.Ed.2d 544 (1990). As the Court of Appeals for the Third Circuit has stated:

While ideally every affidavit would contain direct evidence linking the place to be searched to the crime, it is well established that direct evidence is not required for the issuance of a search warrant. Instead, probable cause can be, and often is, inferred by "considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide stolen property."

*United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir.1993) (quoting *United States v. Jackson*, 756 F.2d 703, 705 (9th Cir.1985)).

■ Probable cause to believe that one has committed a crime does not establish probable cause to search that person's home, but it is not irrelevant to the inquiry. "If there is probable cause to believe that someone committed a crime, then the likelihood that that person's residence contains evidence of the crime increases." *Id.* at 1055–56.

■ The Magistrate Judge had a substantial basis for crediting the hearsay information in the Baldwin Road affidavit. The Baldwin Road affidavit clearly sets forth C.W.'s basis of knowledge—active participation over a long period in the crime detailed in the Baldwin Road affidavit. Moreover, C.W.'s veracity and reliability was confirmed not only in the Fictitious Name Index and county property records, but also by the items retrieved from the garbage left at the curb of 1352 Pesavento Drive and discussions two other witnesses, C.W.–1 and C.I. In turn, the statements of those witnesses are corroborated by C.W.'s accounts and the Government's past dealings with them.

The Magistrate Judge had a substantial basis for concluding the Ciocco, Conley, Smith, Reed and Ferrell were conducting an

illegal gambling business in violation of 18 U.S.C. 1955, notwithstanding the reorganization undertaken in January, 1990. From C.W.'s account of the relationships between "new" vending companies, Matrix and Premier Enterprises, from the nature of the items retrieved in the trash search, and from the accounts of C.W., C.W.–1 and C.I. it is certainly reasonable to infer that Duffy Conley was still in charge of the illegal gambling business. Moreover, it is reasonable to infer that Duffy Conley regularly was conducting at least some of the illegal gambling business's affairs from his residence. Under the totality of the circumstances, the Magistrate Judge had a substantial basis for concluding that 467 Baldwin Road would contain evidence of the illegal gambling operation alleged in the Baldwin Road affidavit.

■ Duffy Conley also contends that the laundry list of items to be seized are indicative of an unlawful general rummaging. He contends that the Baldwin Road affidavit fails to set forth any information even suggesting that any business records, ledgers, books, banking information, loans, computers or other instrumentalities of an illegal gambling business would be present, thus failing to provide a nexus between the items sought and the location to be searched.

The Court is constrained to disagree. The Baldwin Road affidavit indicates that Duffy Conley does substantial business for the illegal gambling operation from his residence. Given the sophistication of the operation described in the Baldwin Road affidavit and the large sum of money seen at the residence, it is a reasonable inference to say it is fairly probable that there will be detailed records there as well.

The Pretrial Motions of John F. "Duffy" Conley: Motion to Suppress [9/91 search of residence; probable cause; execution], (Document No. 377, in part), will be denied.