UNITED STATES of America

v.

**Ricky Joe SHUGART, and Lori Ann Leach, Defendants.**

**No. 3:94 cr 17.**

United States District Court, E.D. Texas, Paris Division.

May 11, 1995.

Randall L. Fluke, Sherman, TX, for plaintiff.

Deborah L. McGregory, Sherman, TX, John Thomas Haughton, McKinney, TX, for defendants.

## MEMORANDUM OPINION

JUSTICE, District Judge.

## I. Introduction

Defendants Ricky Joe Shugart and Lori Ann Leach, who are brother and sister, were indicted and arraigned on various charges relating to their alleged possession and manufacture of methcathinone, a controlled substance. Trial in the above-entitled criminal action is currently set to commence on May 15, 1995. Defendants have filed motions to suppress evidence, on the grounds that various searches conducted by law enforcement agents violated their constitutional and statutory rights. A hearing on such motions was conducted on April 10, 1995, before the undersigned judge. After careful consideration of the testimony presented at the hearing, as

well as the parties' briefs, it has been determined that evidence obtained from defendant Leach's mobile home, the contents of a package, addressed to defendant Shugart, seized from the Randolph, Texas post office, and defendant Leach's incriminating statements must be suppressed from evidence, but that all other evidence obtained during the searches and seizures discussed herein is admissible. Accordingly, defendants' motions to suppress evidence shall be granted in part, and denied in part.

## II. Factual Findings

Based on the evidence adduced at the suppression hearing, the facts surrounding the searches and seizures at issue are found to be as follows:

Agents of the Drug Enforcement Administration (DEA) began investigating defendants' alleged narcotics activity, when DEA Task Force Officer (TFO) Michael Keene received a "tip" that defendants were involved with the illicit production of methcathinone. The tip was provided by a DEA agent in Wichita, Kansas, who told TFO Keene that a confidential informant (CI) in Kansas indicated to him that defendant Shugart was in possession of a "N–Methcathinone laboratory." The CI also advised that Shugart was ordering ephedrine, a substance needed to produce methcathinone, from Olympus Distributing Company (Olympus) and T & M Distributing Company (T & M), and that Shugart would occasionally have his sister, defendant Leach, order the ephedrine.[1] The CI also related that he, the CI, had been on defendant Shugart's and defendant Leach's properties near Bonham, Texas, within the month preceding the tip, and had observed a methcathinone laboratory on defendant Shugart's property, and methcathinone and chemicals used to produce methcathinone on defendant Leach's property.

Before taking other actions, TFO Keene decided to verify the information provided by the CI. He contacted T & M in Council Bluffs, Iowa, and inquired as to whether

---

1. Ephedrine apparently has lawful uses as a diet suppressant, and it is not illegal to order the drug from mail order houses.

defendant Shugart or his sister had ordered ephedrine. A representative of T & M advised TFO Keene that defendants recently had placed several large orders for ephedrine, and that the orders had been sent to Bonham, Texas.

On November 8, 1994, the T & M representative telephoned TFO Keene and informed him that defendant Shugart had recently ordered 3,000 tablets of ephedrine to be sent to a post office box located in the Randolph, Texas, post office. TFO Keene confirmed this information by contacting a postal inspector who affirmed that a package from T & M addressed to defendant Shugart had indeed arrived at the Randolph post office. The postal inspector also told TFO Keene that defendant Shugart had received a second package from Olympus. Both packages were sent "collect on delivery," requiring that defendant Shugart pay for the packages before retrieving them. DEA agents and United States Postal Inspectors then established surveillance of the Randolph post office. At approximately 10:00 a.m. on November 14, 1994, defendant Shugart and a woman, later identified as his wife, arrived at the post office. Defendant Shugart entered the post office and paid for the package from Olympus. Apparently, he told a postal inspector inside the post office that he had enough money to pay for only one of the packages, and that he would return later for the package from T & M. Shugart then returned to the car, and the agents followed him and his wife to defendant Leach's mobile home, located in a rural area near Bonham, Texas. Once there, defendant Shugart exited the car and carried the package inside the mobile home. His wife, still followed by DEA agents, then drove to a grocery store in Bonham, Texas, where a DEA agent observed her purchase Red Devil lye and epsom salt, which are also ingredients used to produce methcathinone. The surveilling agents then pursued her on the return trip to defendant Leach's mobile home.

While conducting this surveillance, TFO Keene contacted the CI in Kansas by calling him on a cellular telephone. The CI related that he had aided defendant Shugart in manufacturing methcathinone on defendant Shugart's property on two separate occasions in August 1994, and that he had observed methcathinone, ephedrine, and other chemicals used to produce methcathinone on defendant Leach's property in August 1994.

Based on the surveillance and his conversation with the CI, TFO Keene decided to apply for warrants to search both defendant Shugart's property and defendant Leach's property. Thereafter, TFO Keene hastily drafted an affidavit incorporating the above facts, and presented it to Magistrate Judge Robert Faulkner in Sherman, Texas, at approximately 2:00 p.m. that same day.

Before presenting the applications and affidavits to Magistrate Judge Faulkner, however, TFO Keene discovered that the application and forms of warrant contained several minor errors. Apparently, TFO Keene, or the Assistant United States Attorney who prepared some of the documents, utilized a form when drafting them which had previously been used to acquire a warrant authorizing a search for cocaine. Both the application for the search warrant and the warrant itself referred to "cocaine" instead of "methcathinone."

TFO Keene brought the mistakes to the magistrate judge's attention, and the magistrate judge instructed him to mark through the references to "cocaine," insert "methcathinone," and initial the hand-written changes. TFO Keene complied with these instructions, and the magistrate judge then signed the warrants containing TFO Keene's interlineations. See Def. Shugart's Mot. to Suppress, March 20, 1995, at Ex.'s A & B.

However, TFO Keene and the Assistant United States Attorney failed to detect the mistake on a form entitled "Application and Affidavit for Search Warrant," which basically serves as a cover sheet for TFO Keene's affidavit in support of the warrants. On that document the items to be searched for are described as "evidence, instrumentalities or fruits of the crime of conspiracy to possess or distribute *cocaine*." See *id.*, at Ex. A1 (emphasis added).

After the warrants were issued, TFO Keene returned to Bonham, Texas, and briefed the DEA "raid team" that was to

execute the warrants. The agents discussed the facts leading to the acquisition of the search warrants, and the fact that defendant Shugart had a previous weapons offense. They determined that agents would raid Leach's mobile home and an unattached, open-faced garage adjacent to the mobile home simultaneously, because agents had observed a person in the garage and were concerned that he or she might pose a safety risk to the agents. No agent, however, testified that the "raid team" discussed who was to announce the agents' presence and authority before entering the mobile home or garage, or whether there was any need for such an announcement.

The agents commenced the raid on defendant Leach's property at approximately 5:30 p.m. that afternoon. At the time of the raid, defendant Leach was in the kitchen preparing hamburgers and talking with defendant Shugart's wife. Several young children, and defendant Leach's boyfriend, were watching television in the nearby living room. According to the uncontroverted testimony of defendant Leach, the agents did not "knock and announce" before entering the mobile home, but rather burst through the mobile home's unlocked, but closed, front door with their firearms drawn and leveled at defendant Leach and the others. As the agents came rushing in, they ordered everyone to lie on the floor. According to Leach, the agents did not identify themselves as law enforcement officers, and she and the other occupants were left to deduce their law enforcement status from the "DEA"-marked windbreaker jackets the agents were wearing. Leach and the other adults were handcuffed. Not surprisingly, the sudden intrusion greatly frightened and confused them, and it took several minutes for them to realize what was transpiring.

Subsequently, TFO Keene "interviewed" Leach twice in a back bedroom of the mobile home. During their first meeting, TFO Keene informed Leach of her rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and then told her that she should take some time to decide whether she wished to cooperate with the government. He advised her to go back into the den and consider her situation, and that he would speak with her again later. During the second interview, Leach made incriminating statements.

The agents raiding the garage found defendant Shugart standing near the center of the structure in close proximity to a "work bench," which contained glass laboratory equipment, bottles of various substances, and several electric "hand mixers," one of which was gyrating intermittently as if there were a short in its power source. DEA agent Marlin Suell, the first into the garage, "identified" himself, and then commanded defendant Shugart to lie on the floor. Shugart complied, and he was handcuffed by another agent. The agents frisked defendant Shugart, and found numerous "plastic baggies" in his coat pocket which were ultimately seized. The agents then read defendant Shugart his *Miranda* rights. Chemists were called to defendant Leach's property, and they and the DEA agents "processed" the scene. Subsequently, agents seized several containers containing liquid substances, measuring cups, funnels, an empty ephedrine tablet bottle, and sundry other substances and laboratory equipment from the garage.

At some point during these events, DEA agents transported defendant Shugart to his nearby mobile home and executed the second search warrant issued by Magistrate Judge Faulkner. Assorted chemistry magazines, literature on clandestine labs, and a letter were found and seized from defendant Shugart's property.

The agents also decided to acquire the unretrieved package from T & M. Although defendant Shugart was readily available, DEA agents approached defendant Shugart's wife and asked her if she would agree to accompany them to the Randolph post office and "sign" for the package from T & M addressed to her husband. Defendant Shugart's wife agreed, and with her help, agents seized the package from the Randolph post office. Subsequently, defendant Shugart's wife signed a consent-to-search form authorizing the agents to open the package. *See* Govt.'s Response to Mot. to Suppress, April 3, 1995, Ex. 5. When agents opened the package, they found 3,000 ephedrine tablets.

### III. Analysis

#### A. The Search Warrants

Defendants contend that TFO Keene's affidavit in support of the search warrants issued by Magistrate Judge Faulkner did not detail probable cause to believe contraband or evidence of a crime would be found on defendant Shugart's or defendant Leach's property, and therefore the evidence seized as a result of the searches of those locations should be excluded from evidence. In addition, defendants argue that the use of the word "cocaine" on the cover sheet to TFO Keene's affidavit renders the searches for methcathinone and related materials unreasonable. The government responds that the uncorrected reference to "cocaine" on the application form is unimportant, since the search warrants themselves, as well as the substantive aspects of TFO Keene's affidavit, refer only to methcathinone. In addition, the government asserts that the search warrants were based upon probable cause, or, alternatively, if probable cause is found to be lacking, the evidence seized as a result of the search warrants should not be suppressed under the good faith exception to the exclusionary rule.

■ In determining whether there is probable cause to authorize a search, the official to whom the application for a warrant is presented must make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. McKeever*, 5 F.3d 863, 865 (5th Cir.1993). When reviewing a magistrate's determination of probable cause, deference must be given to the magistrate's conclusion, and the affidavit upon which the magistrate's conclusion rests must be construed in a common-sense manner. *United States v. McCarty*, 36 F.3d 1349, 1356 (5th Cir.1994); *see also Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527

(1983) (The task of a court reviewing a magistrate's finding of probable cause is to decide whether there was a "substantial basis" for that determination).

■ TFO Keene's affidavit provides a substantial basis for the magistrate judge's conclusion that it was fairly probable that agents would find the items listed in the search warrants on defendants' respective properties. The affidavit relates information from the CI that strongly suggests defendants were involved with narcotics trafficking, *i.e.*, the informant was aware that defendants had ordered large amounts of ephedrine, an essential ingredient used to manufacture methcathinone; the CI had observed a "methcathinone laboratory" on defendant Shugart's property in the past; the informant had witnessed defendant Shugart manufacture methcathinone on two occasions; and the CI had observed methcathinone and chemicals used to manufacture methcathinone were stored on defendant Leach's property.[2]

■ The government, however, did not rely exclusively upon the CI's uncorroborated accusations when they sought the warrants to search defendants' properties. Instead, DEA agents verified much of the information supplied by the CI through their investigation and surveillance of defendants' activities. For instance, they determined that defendants had ordered ephedrine from the same companies referenced by the CI; and on the day of the search, they observed several key ingredients used in the production of methcathinone, including ephedrine, being brought to defendant Leach's mobile home. While the affidavit says very little about the CI's veracity and reliability, a substantial portion of the affidavit relates facts which corroborate information supplied by the CI. *See United States v. Broussard*, 987 F.2d 215, 222 (5th Cir.1993), *overruled on other grounds*, *J.E.B. v. Alabama ex rel. T.B.*, —— U.S. ——, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (information supplied by

---

**2.** Defendant Shugart's argument that these statements are hearsay and should not be considered is without merit. Hearsay statements may be used to support the issuance of a search warrant, if there are corroborating facts which establish that the hearsay statements are reliable. *United*

*States v. McCarty*, 36 F.3d 1349, 1356 (5th Cir. 1994). The facts developed by the DEA agents during their surveillance provide sufficient corroboration of these statements to justify the magistrate judge's reliance upon them.

confidential informant, which was corroborated by other evidence, supported magistrate's finding of probable cause to search, despite lack of evidence as to the informant's reliability or veracity). In addition, the reliability of the CI's statements is enhanced by the fact that the CI's statements were inculpatory and potentially could subject the CI to criminal sanctions. *See McKeever,* 5 F.3d at 865 (finding confidential informant's statements were corroborated when law enforcement official's verified some of the claims made by the informant, and when the informant's statements were against his penal interest). Accordingly, it is found that TFO Keene's affidavit adequately supports Magistrate Judge Faulkner's finding of probable cause, and hence defendants' argument that the searches of their properties were unreasonable based upon a lack of probable cause must fail.[3]

## B. Execution of the Search Warrant for Defendant Leach's Property

The uncontroverted testimony adduced at the suppression hearing establishes that the DEA agents failed to announce their purpose and authority before entering defendant Leach's mobile home or the unattached, open-faced garage adjacent to the mobile home. Defendants contend that this failure violates both their statutory and constitutional rights, and that the evidence seized as a result of these violations should be suppressed. The government argues that the no-knock entries were justified under exceptions to the "knock and announce" rule, or alternatively, that evidence should not be suppressed by reason of the inevitable discovery and good faith exceptions to the exclusionary rule. The agents' unannounced entries into the mobile home and garage shall be separately considered, since their structural disparities require distinct legal analyses.

### 1. Entry into the Mobile Home

The requirement that law enforcement officers executing a search warrant on a person's home first knock and identify themselves, state their purpose for demanding entry, and allow the occupants time to open the door before forcibly entering, has deep-rooted common law origins that extend far beyond the adoption of the Constitution. *See Ker v. California,* 374 U.S. 23, 47, 83 S.Ct. 1623, 1636, 10 L.Ed.2d 726 (1963) (Brennan, J., dissenting) ("It was firmly established long before the adoption of the Bill of Rights that the fundamental liberty of the individual includes protection against unannounced police entries."). The rule strives to protect several fundamental interests of both the police and private citizens, including: "(1) protecting law enforcement officers and household occupants from potential violence; (2) preventing the unnecessary destruction of private property; and (3) protecting people from unnecessary intrusion into their private activities." *United States v. Sagaribay,* 982 F.2d 906, 909 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 160, 126 L.Ed.2d 120 (1993).

In 1917, Congress codified the rule in what is now commonly referred to as the "knock and announce" statute. *See* 18 U.S.C. § 3109. Section 3109 allows a federal officer executing a search warrant to "break open" a door only if "after notice of his authority and purpose, he is refused admittance." The remedy for a violation of the "knock and announce" statute is suppression of the evidence obtained as a result of the unlawful governmental entry. *See Miller v. United States,* 357 U.S. 301, 313–14, 78 S.Ct. 1190, 1197–98, 2 L.Ed.2d 1332 (1958); *United States v. Becker,* 23 F.3d 1537, 1541 (9th Cir.1994).

An officer's failure to "knock and announce" when executing a search warrant has Fourth Amendment implications as well. Although the Supreme Court has not yet addressed the precise constitutional contours of the "knock and announce" requirement, it appears that the failure of law enforcement officers to "knock and announce" prior to

---

**3.** Defendants' argument that the uncorrected reference to "cocaine" on the cover sheet to TFO Keene's affidavit somehow vitiates the otherwise valid warrant is wholly without merit. As stated, the warrants themselves as well as the substantive aspects of TFO Keene's affidavit refer only to methcathinone and related materials.

breaking into a person's residence to execute a search warrant is relevant to the reasonableness of a search under the Fourth Amendment. *See Ker*, 374 U.S. at 40, 83 S.Ct. at 1633 (plurality opinion) (unannounced entry justified when officers had knowledge that easily disposable narcotics were within dwelling and when officers had reason to believe suspect was expecting the police).[4]

The United States Court of Appeals for the Fifth Circuit has held that the Fourth Amendment does not "inflexibly incorporate[ ] the *requirements of § 3109 into its* reasonableness requirement." *Sagaribay*, 982 F.2d at 910. Instead, the interests sought to be protected by 18 U.S.C. § 3109 should be considered in conjunction with the totality of circumstances surrounding a search when determining whether that search was reasonable in Fourth Amendment terms. *Id.*

■ Under both the Fourth Amendment and the "knock and announce" statute, defendants bear the initial burden to establish an unannounced entry actually occurred. *United States v. Mueller*, 902 F.2d 336, 344 (5th Cir.1990). If this showing is made, it becomes the government's burden to justify the search. *Id.* Here, defendants plainly have met their burden to show the DEA agents entered Leach's mobile home unannounced. Defendant Leach testified that the DEA agents not only failed to "knock and announce" before entering the mobile home, but that they refused to identify themselves and their purpose after the intrusion. The government presented *no contrary evidence.*

■ Nonetheless, the government advances several theories to justify the unannounced search. First, the government argues that the "knock and announce" requirement of section 3109 was never triggered, because the front door of Leach's mobile home was unlocked, and hence the DEA agents did not "break open" any door to gain entry into the mobile home. The Supreme Court directly addressed this argument over

twenty years ago, and squarely ruled against the position now espoused by the government:

> Considering the purposes of § 3109, it would indeed be a "grudging application" to hold, as the Government urges, that the use of "force" is an indispensable element of the statute. To be sure, the statute used this phrase "break open" and that connotes some use of force. But linguistic analysis seldom is adequate when a statute is designed to incorporate fundamental values and the ongoing development of common law.... An unannounced intrusion into a dwelling—what § 3109 basically proscribes—is no less an unannounced intrusion whether officers break down a door, force open a chain lock on a partially open door, open a locked door by use of a passkey, or, as here, *open a closed but unlocked door.* The protection afforded by, and the values inherent in, § 3109 must be "governed by something more than the fortuitous circumstance of an unlocked door."

*Sabbath v. United States*, 391 U.S. 585, 589–90, 88 S.Ct. 1755, 1759, 20 L.Ed.2d 828 (1968) (footnotes and citations omitted) (emphasis added). The front door of Leach's mobile home was unlocked, but shut, at the time the DEA agents commenced their raid. Accordingly, the agents "broke open" a door within the meaning of the statute, and, unless an exception to the statute is applicable, the agents violated the statute by failing to announce their presence and purpose, and wait for a refusal to enter, before bursting into the mobile home.

■ Next, the government contends that the exigent circumstances exception to the "knock and announce" statute justifies the agent's "no-knock" entry into Leach's mobile home. Officers are excused from compliance with the "knock and announce" statute, where it would otherwise apply, if they can show they were aware of exigent circumstances justifying an unannounced entry at the time the search warrant was executed.

---

4. A case recently argued before the Supreme Court raises many previously unresolved issues concerning the constitutional dimensions of the "knock and announce" rule. *See Wilson v. Ar-* *kansas*, No. 94–5707, (argued March 28, 1995), *argument discussed in*, 57 Crim.L.Rep. (BNA) No. 1, at 3003 (April 5, 1995).

See *Sabbath*, 391 U.S. at 591 n. 8, 88 S.Ct. at 1759 n. 8; *United States v. Carter*, 566 F.2d 1265, 1269 (5th Cir.), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *United States v. Garcia Mendez*, 437 F.2d 85, 86 (5th Cir.1971). The government contends that compliance with the "knock and announce" statute should be excused, because the DEA agents reasonably believed evidence would be destroyed if they announced their presence prior to the raid.[5]

Although the "destruction-of-evidence" exception to the "knock and announce" rule is often invoked, considerable disagreement exists as to what showing must be made to justify an unannounced entry based on the potential disposal or destruction of evidence. *See generally* 2 Wayne R. LaFave, *Search and Seizure* § 4.8(d) (2 ed. 1987 & Supp. 1995). In explicating the exigent circumstances exception, some courts have adopted a blanket rule which allows law enforcement agents to commit unannounced entries whenever they have probable cause to search a home for drugs or other easily disposed of items. *See United States v. One Parcel of Real Property*, 873 F.2d 7, 9 (1st Cir.), *cert. denied*, 493 U.S. 891, 110 S.Ct. 236, 107 L.Ed.2d 187 (1989); *United States v. Tolliver*, 665 F.2d 1005, 1008 (11th Cir.), *cert. denied*, 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982); *United States v. Jackson*, 585 F.2d 653, 662 (4th Cir.1978). Other courts have adopted a narrower approach which requires law enforcement officers to be aware of particular facts, beyond the mere presence of narcotics in a home, which establish a reasonable belief that drugs are likely to be destroyed if the officer's presence and purpose is announced prior to the search. *See United States v. Wulferdinger*, 782 F.2d 1473, 1476 (9th Cir.1986); *United States v. Stewart*, 867 F.2d 581, 585 (10th Cir.1989); *United States v. Likas*, 448 F.2d 607, 609 (7th Cir.1971).

 In *United States v. Carter*, 566 F.2d 1265 (5th Cir.1978), the Fifth Circuit expressly recognized the exigent circumstances exception to the "knock and announce" statute, but did not spell out exact parameters for the exception. Nevertheless, the court found sufficient exigencies to excuse a violation of the "knock and announce" rule when law enforcement officers were searching for readily disposable narcotics *and* when the officers were "virtually certain" that persons inside the home had detected the officer's presence and knew their purpose for being there. *Id.* at 1269.[6] Hence, it appears that the Fifth Circuit requires officers to be aware of something beyond the mere fact that the object of their search was readily disposable narcotics before they may forego the "knock and announce" requirement.

 The government, however, relies on just such a tenuous rationale to support the agents' unannounced entry into defendant Leach's mobile home. At most, the government has shown that the agents were aware that chemicals used to produce methcathinone had been brought to Leach's property, and that such chemicals might be easily de-

---

5. The government also argues that the "no-knock" entry was justified based on the DEA agent's reasonable perception that an announcement of their presence and purpose would increase the peril to themselves during the raid. This contention is without merit. No evidence was presented to show the agents were aware of any facts or circumstances which would show anyone on Leach's property possessed a weapon or was violent in nature. Though the government alleges that the agents were aware that defendant Shugart had previously been convicted of a weapons offense, information that a suspect has been convicted of a crime involving weapons at some undisclosed time in the past, without more, is not sufficient to absolve an otherwise unlawful execution of a search warrant. *See United States v. Lucht*, 18 F.3d 541, 551 (8th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 363,

130 L.Ed.2d 316 (1994) (unannounced entry was illegal when officers "knew that there was a likelihood that there were weapons in the house, but ... had no information indicating that Krees was considered dangerous or violent, or might be inclined to use the weapons."); *United States v. Marts*, 986 F.2d 1216, 1218 (8th Cir.1993) ("The reasonable belief that firearms may have been within the residence, standing alone, is insufficient [to justify an unannounced entry]").

6. In fact, the officers' concern that evidence might be destroyed was well-founded, for when the officers entered the home they discovered the defendant and another individual bent over a toilet attempting to flush drugs. *See Carter*, 566 F.2d at 1268.

stroyed.[7] The government presented no evidence that the DEA agents executing the search warrant for the mobile home had reason to believe that anyone inside the mobile home knew of the agents' presence or their purpose and thus were likely to be in the process of destroying evidence. *Cf. United States v. Conley,* 859 F.Supp. 887 (W.D.Pa.1994) (exigent circumstances justified entry when officers' observations indicated evidence was being destroyed). Similarly, no agent testified that they were aware that anyone inside the mobile home had made arrangements to dispose of evidence in the event of a police raid.

Although the government argues that the agents were concerned that liquid chemicals used in the manufacture methcathinone could have been rapidly disposed of, no evidence was adduced to show the agents reasonably suspected that the manufacturing process had actually begun or that the ephedrine was stored in liquid form. *Cf. United States v. Keene,* 915 F.2d 1164, 1168–69 (8th Cir.1990), *cert. denied,* 498 U.S. 1102, 111 S.Ct. 1001, 112 L.Ed.2d 1084 (1991) (unannounced entry justified because "persons who traffic in liquid narcotics often attempt to dispose of them, *i.e.,* by pouring them down a sink or floor drain."). In fact, TFO Keene testified that none of the agents in the "raid team" had firsthand knowledge of the manner in which ephedrine is manipulated to manufacture methcathinone. And no witness testified that they sensed any odors or other indicia associated with the manufacture of methcathinone.

██ Instead, the government relies on the agents' generalized concern that evidence might have been destroyed if they had announced their presence and purpose before entering Leach's mobile home. Such generic concerns, however, exist in almost every case involving a search for drugs. If such concerns were sufficient to abate the necessity to comply with the congressionally mandated "knock and announce" rule, agents would be excused from the rule in almost every situation where they executed a drug-related search warrant on a citizen's residence, since most narcotics are kept in readily disposable quantities and most homes are furnished with plumbing facilities which could be used to eliminate the drugs. *See United States v. Hidalgo,* 747 F.Supp. 818, 831 (D.Mass.1990) (finding officers' awareness of three kilograms of cocaine in apartment did not justify officers' failure to comply with § 3109 during search of apartment); *see also* Charles P. Garcia, *The Knock and Announce Rule: A New Approach to the Destruction–Of–Evidence Exception,* 93 Colum.L.Rev. 685, 699 (1993) (noting that under the blanket approach to the destruction-of-evidence exception "the police meet their burden ... simply by showing that the objects sought are drugs and that the residence had normal plumbing."). This result would not comport with the Supreme Court's statement in *Miller v. United States,* 357 U.S. 301, 313, 78 S.Ct. 1190, 1197, 2 L.Ed.2d 1332 (1958):

> The requirement of prior notice of authority and purpose before forcing entry into a home is deeply rooted in our heritage and should not be given a grudging application. Congress, codifying a tradition embedded in Anglo–American law, had declared in § 3109 the reverence for of the law for the individual's right of privacy in his house.

Accordingly, the government has not carried its burden to justify the unannounced entry into defendant Leach's mobile home under the exigent circumstances exception to 18 U.S.C. § 3109, and unless an exception to the exclusionary rule applies, the evidence obtained as a result of the illegal entry into the mobile home must be suppressed from evidence.[8]

### a. Good Faith Exception

██ The government argues that even if the agents entry into the mobile home was

---

7. It is by no means clear, however, that the agents reasonably believed that the chemicals carried into Leach's mobile home, a package of ephedrine tablets, and containers of epsom salt and red devil lye, were of an amount or maintained in a manner that made rapid disposal feasible.

8. As it has been determined that the agents violated the "knock and announce" statute, defendants' contention that the agents' entry also violates the Fourth Amendment need not and will not be addressed.

unlawful, the evidence seized as a result should not be suppressed from evidence, since the agents acted on a reasonable good faith belief that an unannounced entry was justified. In *United States v. Williams,* 622 F.2d 830, 840 (5th Cir.1980) (en banc), *cert. denied,* 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981), the Fifth Circuit held that "evidence is not to be suppressed under the exclusionary rule where it is discovered by officers in the course of actions that are taken in good faith and in the reasonable, although mistaken, belief that they were authorized." The good faith exception, however, "is not devised for the unlawful conduct of all officers who mean well." *United States v. Whaley,* 781 F.2d 417 (5th Cir.1986). Rather, the good faith belief must also be objectively reasonable. *United States v. Leon,* 468 U.S. 897, 919, 104 S.Ct. 3405, 3418–19, 82 L.Ed.2d 677 (1984); *Whaley,* 781 F.2d at 421; *Williams,* 622 F.2d at 844.

■ To date, the exception has been primarily applied to situations in which the police interpret or rely on an external source of authority, such as a warrant or a statute, which later turns out to be invalid or not to authorize the action taken. *See, e.g., Williams,* 622 F.2d at 844 (reasonable belief that statute authorized arrests); *United States v. Mahoney,* 712 F.2d 956 (5th Cir. 1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3590, 82 L.Ed.2d 887 (1984) (reliance on arrest warrant); *see also United States v. De Leon–Reyna,* 930 F.2d 396, 403 (5th Cir.1991) (en banc) (King, J., concurring in the judgment). In addition, the exception has been applied where the police reasonably rely on erroneous information that, had it been true, would have justified the action taken. *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (consensual search valid where officers reasonably believed that occupants of apartment had common control over premises, and therefore had authority to consent to a search of the apartment); *De Leon–Reyna,* 930 F.2d at 401–402 (*Terry* stop valid where officer reasonably relied on report from dispatcher indicating that license plate on vehicle was stolen). However, the government has not provided, and the court is not aware of, any case holding the exception applies to pre-clude suppression of evidence seized after police mistakenly believe disobedience of the "knock and announce" statute is justified, when in fact it is not. *Cf. United States v. Marts,* 986 F.2d 1216, 1219 (8th Cir.1993) (finding the good faith exception to the exclusionary rule did not apply to prevent the suppression of evidence obtained after a violation of § 3109).

■ Even if it is assumed the good faith exception applies to such a situation, the government has not met its burden to show the exception applies in these circumstances. First, no agent testified at the suppression hearing that he actually believed they were justified in ignoring the general requirement that they knock and announce their presence and authority before breaking into Leach's home. In fact, the evidence adduced at the suppression hearing shows the "raid team" had no compunction about bursting into Leach's mobile home unannounced, for they never considered the need to make an announcement before commencing the raid. Second, no evidence was presented to show such a belief would be objectively reasonable. To the extent the agents rely on their knowledge that they were conducting a search for a "clandestine drug lab," such information, without more, does not support an objectively reasonable good faith belief that a "no-knock" entry was justified. As discussed above, the mere fact that law enforcement officials are searching for readily disposable narcotics does not justify an unannounced entry. Accordingly, the government has not carried its burden to show the good faith exception to the exclusionary should apply to the evidence seized from Leach's mobile home. *See id.* at 1219.

**b. Inevitable Discovery**

In its post-trial brief, the government makes a one paragraph argument that even if the illegality of the entry into Leach's mobile home is acknowledged, the evidence seized as a factual result of that entry is nonetheless admissible under the inevitable discovery doctrine. Defendants have not addressed this contention, and little evidence

relating to this issue was·adduced at the hearing.[9]

The doctrine of inevitable discovery was first articulated by the Supreme Court in *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), and briefly discussed in *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). Because the core rationale of the exclusionary rule is to deter police misconduct, the prosecution must not be put in a better position as a result of police illegality. *Nix v. Williams*, 467 U.S. at 442–43, 104 S.Ct. at 2508–09. The inevitable discovery doctrine is designed to ensure that the prosecution is not put in a *worse* position simply because of police misconduct. *Id.* at 443, 104 S.Ct. at 2509 (emphasis in original). Its rationale is akin to that for the independent source doctrine: "*Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." *Murray*, 487 U.S. at 539, 108 S.Ct. at 2534 (emphasis in original).

For the "inevitable discovery" exception to the exclusionary rule to apply, the government must prove by a preponderance of the evidence (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial alternative line of investigation at the time of the constitutional violation. *United States v. Wilson*, 36 F.3d 1298, 1304 (5th Cir.1994); *United States v. Lamas*, 930 F.2d 1099, 1102 (5th Cir.1991) (citing *United States v. Cherry*, 759 F.2d 1196, 1205–06 (5th Cir.1985), *cert. denied*, 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987)). The inev-

itable discovery exception involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment. *Nix v. Williams*, 467 U.S. at 445 n. 5, 104 S.Ct. at 2510 n. 5; *Lamas*, 930 F.2d at 1102.

All inevitable discovery arguments are counter-factual and are often made when the government is. "clinging to the last straw." *United States v. Amuny*, 767 F.2d 1113, 1129 n. 10 (5th Cir.1985). Here, for example, the government is asking the court to ignore a flagrant violation of the "knock and announce" statute, and imagine a situation where agents fully complied with their legal obligations when executing the search warrant for Leach's mobile home. The hypothetical may be accepted and the illegally seized evidence admitted only if the government proves by a preponderance of the evidence that the scenario it envisions would have happened but for the agents' violation. To do so, the government must prove facts about the specific situation under consideration and the general practices of the agent/department involved, so that it may be determined that a lawful seizure of evidence ultimately would have occurred if not for the violation that did occur. In this action, the government must prove that the execution of the search warrant for defendant Leach's mobile home would have been lawful but for these specific agents' failure to knock and announce; that is, the government must prove that other agents executing the search warrant would have complied with the "knock and announce" rule.

The government has failed to carry this burden. In fact, the assertions contained in the government's post-hearing brief contradict its inevitable discovery argument. In

---

9. While there is a wealth of case law on the "knock and announce" statute and the inevitable discovery doctrine considered as separate matters, research has revealed scant case law discussing the potential applicability of the inevitable discovery doctrine to a violation of the "knock and announce" statute. *See United States v. Hidalgo*, 747 F.Supp. 818, 831–36 (D.Mass.1990) (suppressing defendant's statements made after officers failed. to comply with § 3109, but finding the inevitable discovery and the independent source exceptions to the exclusionary rule permitted admission of physical evi-

dence seized after the illegal entry); *see also Marts*, 986 F.2d at 1219–20 (stating that the independent source rule does not apply to allow the admission of evidence seized when officers executing a valid search warrant fail to comply with § 3109). Apparently, this issue is raised in *Wilson v. Arkansas*, No. 94–5705, 1995 WL 243487 (argued March 28, 1995), which is currently pending before the Supreme Court. *See* 57 Crim.L.Rep. (BNA) No. 1, at 3003 (April 5, 1995) (discussing oral. argument in *Wilson v. Arkansas* ).

that brief, the government states that DEA agent Phillip Rust "would testify that the DEA manual provides that agents should not knock an announce prior to entering a premises in connection with a clandestine lab...." *See* Govt.'s Brief Regarding Knock and Announce Issue, April 21, 1995, at 5. In addition, the government asserts that DEA agent Robert Hampton, who assisted in the execution of the search warrant, believes that the agents did not have to "knock and announce" because "the search warrants involved a possible clandestine drug lab." *See id.* at 3. Thus, the government's assertions appear to establish that government agents never "knock and announce" when executing a search warrant for a clandestine drug lab. If such is the case, it seems that, even if the agents who committed the unannounced entry into Leach's mobile home had not done so, other agents would have done exactly the same thing. *See Amuny*, 767 F.2d at 1129 n. 10 (government failed to carry its burden under the inevitable discovery doctrine when it "offered no theory suggesting how the agents would have discovered the contraband absent the agents' misconduct"). Accordingly, the government has failed to show the evidence seized from Leach's mobile home would have been lawfully obtained but for the "raid team's" noncompliance with the "knock and announce" statute, and hence such evidence is not admissible under the inevitable discovery doctrine.

▮ Moreover, it must be noted that application of the inevitable discovery doctrine to evidence seized after a clear violation of the "knock and announce" statute would completely viscerate the fundamental privacy and safety interests the statute seeks to secure. If the exception were to apply, officers could obviate their obligation to provide notice of their authority and purpose prior to entering a person's household whenever they had a valid warrant authorizing the search of the home. In those situations, officers would know their misconduct would have no unfavorable consequences, and simply stated, the exception would swallow the rule. Thus, section 3109, in effect, would be an empty vessel, as violations of the statute would not result in any sanction. *See Marts*, 986 F.2d at 1220. Such a result is untenable, especially in light of the "knock and announce" rule's perdurance.

### c. Attenuation

▮ Although the government has not raised the issue, it appears that defendant Leach's incriminating statements should not be suppressed, if they were sufficiently attenuated from the agents' unlawful actions. A statement obtained through custodial interrogation after an illegal arrest must be suppressed, "unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is 'sufficiently an act of free will to purge the primary taint'". *Taylor v. Alabama*, 457 U.S. 687, 690, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982) (quoting *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416–17, 9 L.Ed.2d 441 (1963); *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975); *United States v. Webster*, 750 F.2d 307 (5th Cir.1984) *cert. denied* 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985)). Undoubtedly, defendant Leach had been arrested when she made incriminating statements to TFO Keene during her second interview with him in the back bedroom of the mobile home. At that time, agents had ordered her to lie on the floor, handcuffed her, informed her of her *Miranda* rights, and gave her an opportunity to consider whether she wanted to "cooperate" with the government. But, as it has been determined that TFO Keene and the other agents violated the "knock and announce" statute when executing the search warrant for the mobile home, Leach's arrest was unlawful. *Sabbath v. United States*, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968).

▮ Whether a confession was sufficiently an act of free will so as to be distinguishable from the taint of an illegal arrest will depend on the facts surrounding the particular seizure and confession in question. *United States v. Miller*, 608 F.2d 1089, 1102 (5th Cir.1979), *cert. denied*, 447 U.S. 926, 100 S.Ct. 3020, 65 L.Ed.2d 1119 (1980). Factors to consider when determining if the taint of an illegal arrest has been dissipated include:

"the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct." *Taylor,* 457 U.S. at 690, 102 S.Ct. at 2667; *Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62. The government bears the burden of proving that the taint of the illegal arrest is sufficiently dissipated so that the statement may be used at trial. *Taylor,* 457 U.S. at 690, 102 S.Ct. at 2667; *Brown,* 422 U.S. at 604, 95 S.Ct. at 2262.

In this action, no evidence was presented to establish exactly how much time transpired between the agents' unheralded entry into the mobile home and TFO Keene's second interview with Leach. However, TFO Keene testified that Leach did not incriminate herself until after she had been given *Miranda* warnings and a period in which to consider whether to cooperate with the government. Thus, at least a modicum of time passed between the illegal entry and the statements.

■ Nonetheless, the agents' misconduct cannot be considered anything but a flagrant breach of the "knock and announce" rule. Not only did the agents fail to precede their entry with proper notice, the uncontroverted evidence presented at the suppression hearing establishes that the agents failed to identify themselves as law enforcement officers once inside the mobile home. Such misconduct is wholly unjustified and thwarts one of the elemental rationales supporting the "knock and announce" rule, protection of citizens' privacy in their own homes.

■ Under these facts, Leach's awareness of her *Miranda* rights and the brief opportunity given her to mull the decision whether to cooperate with the government are not sufficient extenuating circumstances to attenuate the primary taint of her illegal arrest. Leach's confession came shortly after the agents' egregious violation of the "knock and announce" requirement, and shortly after the agents, with drawn firearms, ordered her to lie on the floor, and handcuffed her. Leach testified that the agents' sudden intrusion and their subsequent actions caused her great anxiety, confusion, and fright. Presumably, those emotions continued to affect her decision-making process when she confessed to TFO Keene. *See United States v. Hidalgo,* 747 F.Supp. 818, 831–32 (D.Mass.1990) (defendant's statements, given fifteen minutes after police violated § 3109 by breaking down his front door with a battering ram, and throwing the defendant to the floor, were sufficiently related to the illegal entry to warrant their suppression). Though TFO Keene informed Leach of her *Miranda* rights prior to her confession, "*Miranda* warnings, standing alone, will not prove that the statement was sufficiently an act of free will." *United States v. Wilson,* 36 F.3d 1298, 1307 (5th Cir.1994) (citations omitted). Accordingly, it is found that Leach's statements resulted from an exploitation of her illegal arrest and were not attenuated from its primary taint. *See id.* at 1306–08 (finding the taint of an illegal seizure was not attenuated, despite the fact that defendant had been read his *Miranda* rights, and transported to postal inspection station prior to confessing, because defendant's confession was attributable to the officer's show of authority); *United States v. Webster,* 750 F.2d 307, 324–35 (5th Cir.1984), *cert. denied,* 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985) (finding taint of illegal arrest not attenuated despite lapse of twelve hours, car trip with police away from the crime scene, and additional *Miranda* warnings).

In sum, it is found that the DEA "raid team" violated the "knock and announce" statute when they burst through the front door of Leach's mobile home, and that both the physical evidence seized from the mobile home, as well as defendant Leach's statements given in the back bedroom of the mobile home, must be suppressed from evidence.

### 2. Entry into the Garage

■ The same cannot be said, however, for the "raid team's" entry into the unattached, open-faced garage adjacent to the mobile home. Unlike a home secured from the world by a closed door, law enforcement agents are generally not required to "knock and announce" when entering completely open buildings. *See United States v. Kemp,* 12 F.3d 1140, 1143 (D.C.Cir.1994) (officers

did not "break open" door within meaning of 18 U.S.C. § 3109 when door to premises swung open after officers knocked on it with reasonable force) (Ginsburg, J.); *United States v. Remigio,* 767 F.2d 730, 733 (10th Cir.), *cert. denied,* 474 U.S. 1009, 106 S.Ct. 535, 88 L.Ed.2d 465 (1985) (officers entering premises through an open door in the presence of the defendant need not comply with 18 U.S.C. § 3109); *United States v. Johns,* 466 F.2d 1364, 1365 (5th Cir.1972) (entry through open door not a "breaking" within meaning of § 3109). Thus, the DEA agents who raided the unattached, open-faced garage did not violate 18 U.S.C. § 3109 when, in the presence of defendant Shugart, they raided the garage without first announcing their presence and authority. *See United States v. Valenzuela,* 596 F.2d 1361, 1365 (9th Cir.), *cert. denied,* 444 U.S. 865, 100 S.Ct. 136, 62 L.Ed.2d 88 (1979) (officer was not required to comply with federal "knock and announce" statute when he entered the defendant's garage after other officers had entered the defendant's residence, because garage was open and the officer's entry did not amount to a "breaking" within the meaning of the statute); *United States v. McClard,* 333 F.Supp. 158, 167–68 (E.D.Ark. 1971), *aff'd,* 462 F.2d 488, *cert. denied,* 409 U.S. 988, 93 S.Ct. 345, 34 L.Ed.2d 255 (1972) (officer's violation of "knock and announce" rule at defendant's residence did not taint unannounced entry into unattached, open barn adjacent to residence); *cf. United States v. Bustamante–Gamez,* 488 F.2d 4, 10 (9th Cir.1973), *cert. denied,* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974) (officers' unannounced entry of garage was proper when made simultaneously to lawful entry at residence's front door).

■ Defendants, however, also contend that the unannounced entry of the garage violates the Fourth Amendment. As detailed above, whether officers provided proper notice of their authority and purpose when executing a search warrant is only one factor to be considered in the "totality of circumstances" when determining whether a particular search complied with the requirements of the Fourth Amendment. *Sagaribay,* 982 F.2d at 910.

■ Considering all the facts surrounding the agents' unannounced entry into the open-faced garage adjacent to Leach's mobile home, it is found that their search of the garage was entirely reasonable, and did not violate the Fourth Amendment. The search of the garage was conducted at approximately 5:30 p.m., while it was still light, and thus it was less likely to disturb defendants' private activities than a search conducted at night. The officers were not required to use any force to enter the garage; thus, there was little danger that defendants' property would be damaged. By identifying himself shortly after entering the garage, DEA agent Suell reduced the potential for violence. Finally, TFO Keene took the precaution of obtaining a search warrant which specifically mentioned the garage, and thus minimized the possibility of an overbroad search. As the agents' search of the garage was reasonable and did not contravene the Fourth Amendment, the evidence seized from the garage need not be excluded from evidence. *See id.* at 910 (finding search reasonable under the Fourth Amendment when officers executing a search warrant entered defendant's apartment using a pass key, announced their identity and purpose while entering, and conducted the search during the daytime).[10]

## C. The Evidence Seized from Defendant Shugart's Clothing

Defendant Shugart was frisked shortly after agents entered the garage. During this search, agents discovered, and ultimately seized, numerous "plastic baggies" from his coat pockets.[11] Defendant Shugart contends

10. Because it has been determined that the evidence seized from the garage need not be suppressed from evidence, the government's argument that defendant Shugart lacks standing to challenge the search of the garage need not be addressed.

11. There was some conflict in the testimony of the witnesses at the suppression hearing as to exactly when these baggies were seized. Defendant Shugart believed agents seized the baggies immediately after frisking him. Contrarily, DEA agents testified that they replaced the baggies after their initial discovery, and did not seize

that this seizure violates his Fourth Amendment rights, because it was conducted before the agents had probable cause to arrest him or even reasonable suspicion to suppose he might be dangerous. The government responds that Shugart's arrest was supported by probable cause and that the subsequent frisk of his external clothing was justified as a search incident to a lawful arrest.

 Officers have probable cause to make a warrantless arrest only if the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are " 'sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed", and that the persons to be arrested committed it. *Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959) (quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925); *United States v. Raborn,* 872 F.2d 589, 593 (5th Cir.1989)). While this standard certainly does not require proof beyond a reasonable doubt, it does require at least a "substantial probability" of criminal activity. *Raborn,* 872 F.2d at 593.

At the time the DEA agents entered the garage, they were aware that defendant Shugart had retrieved a package containing ephedrine, an essential ingredient in methcathinone, and brought it to the mobile home. They also knew that Red Devil lye and epsom salt, other chemicals used to produce methcathinone, had been brought to the mobile home. Further, the agents had been informed by the CI that Shugart was in possession of a methcathinone laboratory, had manufactured methcathinone in the past, and was ordering ephedrine to use in the manufacturing process. When they entered the garage, the agents observed Shugart in close proximity to an array of laboratory equipment and several vessels containing liquid substances. A hand mixer appeared to have been recently used, as it was gyrating intermittently. These facts parallel those in numerous cases where the Fifth Circuit has

found probable cause to arrest or search based upon a suspect's possession of chemicals. *See United States v. Walker,* 960 F.2d 409, 416–17 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 443, 121 L.Ed.2d 362 (1992) (informant stated that defendant possessed precursor chemicals used to manufacturer methamphetamine and informant set up drug buy with defendant); *Raborn,* 872 F.2d at 594 (confidential informant stated that defendants were planning to manufacture illegal drugs and agent detected odor of acid commonly used in the manufacture of amphetamines); *United States v. Hare,* 772 F.2d 139, 142 (5th Cir.1985) (defendant simultaneously purchased laboratory equipment, large quantities of chemicals, and large quantities of ice, all of which were commonly used in the manufacture of amphetamines); *United States v. Gordon,* 580 F.2d 827, 832–833 (5th Cir.), *cert. denied,* 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978) (defendants purchased chemicals which were essential ingredients in the manufacture of methaqualone, gave inconsistent explanations regarding what they intended to use the chemicals for, referred to the chemicals as "drugs", and transported chemicals and lab equipment using evasive driving techniques); *United States v. Martin,* 509 F.2d 1211 (5th Cir.), *cert. denied,* 421 U.S. 967, 95 S.Ct. 1958, 44 L.Ed.2d 455 (1975) (defendants purchased chemicals and agents smelled odor of chemicals that could be used to manufacture methamphetamine, defendants engaged in evasive driving techniques, defendants told seller of chemicals that they were purchasing them for a company, but then drove away from the company toward their house; and defendants stood outside their house and looked around as though they were fearful of being watched).

 Hence, the agents had probable cause to believe Shugart was involved in the criminal manufacture of narcotics when they found and arrested him in the garage. Their subsequent frisk of his outside clothing was justified as a search incident to arrest, and is not unreasonable in Fourth Amendment

them until sometime later. However, the exact time of seizure is irrelevant for the present analy-

sis, and need not be resolved.

terms. *See Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969); *United States v. Johnson*, 16 F.3d 69, 71 (5th Cir.1994). Accordingly, the "plastic baggies" found during that search need not be suppressed from evidence.

### D. The Search of the Package from T & M

While the searches of defendants' properties were conducted pursuant to warrants, the search of the package from T & M was not. Defendant Shugart contends that his Fourth and Fourteenth Amendment rights were violated when DEA agents seized and opened the package mailed to him from T & M, without a search warrant. The government responds that the DEA agents lawfully seized and searched this package, because defendant Shugart's wife voluntarily consented to its search.

The Fourth Amendment protects individuals from unreasonable searches and seizures, and unless one of the well-established exceptions to the warrant requirement is applicable, warrantless searches are presumptively unreasonable. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id.*

■ Generally, the burdens of production and persuasion rest upon the movant in a suppression hearing. *United States v. De La Fuente*, 548 F.2d 528, 533 (5th Cir.), *cert. denied*, 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977), *and cert. denied*, 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1977). However, if a defendant produces evidence that a search was conducted and evidence seized without a warrant, the burden shifts to the government to justify the warrantless search and seizure. *Id.; United States v. Pena*, 961 F.2d 333, 338–39 (2nd Cir.1992). Here, the burden has shifted to the government, because the search of the package from T & M was conducted without a warrant.

■ In order to satisfy its burden, the government must show that the consent to search was freely and voluntarily given, *see Bumper v. North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968), and that the consent was obtained from either the defendant himself, or a person with authority to consent. *See United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). The uncontroverted evidence presented at the suppression hearing establishes that defendant Shugart's wife freely and voluntarily consented to the search of the package; she readily agreed to accompany the DEA agents to the Randolph post office and retrieve the package, and she voluntarily signed a written form authorizing the agents to search the package. Hence, the issue to be determined is whether defendant Shugart's wife had authority to consent to the search of a package mailed to her husband.

■ In *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the Supreme Court explained the requisites for determining whether a third party has sufficient authority to consent to a search of property imbued with another's privacy interest:

> The authority which justifies the third party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection of his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* at 171 n. 7, 94 S.Ct. at 993 n. 7 (1974) (citations omitted). Thus, if the government has shown that defendant Shugart and his wife had joint access and control for most purposes of the package from T & M, and if it reasonable to presume that defendant Shugart had assumed the risk that his wife might permit others to search his mail, his wife's consent to search is valid, and the evidence seized from the package need not be excluded from evidence.

The government acknowledges that the package from T & M was addressed only to defendant Shugart, and not his wife. Nonetheless, the government argues that she had authority to consent to the search, because she was married to the addressee listed on the package. One's spouse, however, does not have *carte blanche* to consent to the search of all one's effects. *See United States v. McAlpine*, 919 F.2d 1461, 1464 (10th Cir. 1990) ("the relevant analysis in third-party consent cases focuses on the relationship between the consenter and the property searched, not the relationship between the consenter and the defendant."). Rather, the spouse may authorize the search of only those items or places over which he or she has a common right of access or shared dominion. *See United States v. Smith*, 930 F.2d 1081, 1085 (5th Cir.1991) (defendant's estranged wife had authority to consent to the search of residence where defendant resided, because she was a co-lessee of the property and because she maintained use, control, and possession of the property); *see also United States v. Sealey*, 830 F.2d 1028, 1031 (9th Cir.1987) (defendant's wife had authority to consent to search of garage and defendant's sealed containers found in the garage when she was part owner of the house, had mutual access to the garage, and when the containers were not marked in any way indicating that they belonged only to her husband).

The information available to the agents at the time defendant Shugart's wife completed the consent-to-search form could not reasonably lead them to believe she had authority to consent to the opening of the package or the examination of its contents. Presumably, the agents knew the package was addressed only to defendant Shugart. No evidence to the contrary was presented. In addition, their surveillance of the Randolph post office revealed that defendant Shugart retrieved his own mail, for the agents had witnessed defendant Shugart, not his wife, enter the post office and retrieve the package from Olympus earlier that day.

Moreover, defendant Shugart cannot be said to have assumed the risk that his wife would consent to allow government agents to search his mail merely by allowing the package to remain in the Randolph post office. There simply was no evidence presented which would show that defendant Shugart's spouse had actual or apparent authority to consent to the search of a package addressed to her husband. As the United States Court of Appeals for the Fourth Circuit stated in *United States v. Block*, 590 F.2d 535 (4th Cir.1978):

it is equally well settled that third party consent, no matter how voluntarily and unambiguously given, cannot validate a warrantless search when the circumstances provide no basis for a reasonable belief that shared or exclusive authority to permit inspection exists in the third person from any source, nor even more certainly, when the circumstances manifest to the contrary that the absent target of the search retains an expectation of privacy in the place or object notwithstanding some appearance or claim of authority by the third person....

*Id.* at 540 (citation omitted). Defendant Shugart certainly maintains a reasonable expectation of privacy in his mail, and such privacy interest should have been readily ascertainable by the DEA agents when they observed that the package was addressed only to defendant Shugart.

The government has failed to carry its burden to show the search of the package from T & M was justified by consent, and hence the warrantless search of the package must be found unreasonable, and thus in violation of the Fourth Amendment. Accordingly, the fruits of that search, the contents of the package from T & M, shall be excluded from evidence in the trial of this action.

## IV. Conclusion

For the foregoing reasons, it has been determined that the DEA agents executing the search warrant for defendant Leach's property violated 18 U.S.C. § 3109 when the burst into her mobile unannounced, and thus the evidence seized from defendant Leach's mobile home, as well as the incriminating statements made by defendant Leach in the back bedroom of the mobile home, shall be suppressed from evidence. Further, it has

been concluded that defendant Shugart's wife did not have authority to consent to the search of the package from T & M. Hence, the fruits of that search must also be suppressed. The evidence seized from the garage and defendant Shugart's mobile home, however, is admissible, since the searches of those locations complied with both the Fourth Amendment and the "knock and announce" statute. Finally, the "plastic baggies" obtained from defendant Shugart's coat pockets are admissible, as they were seized during a search incident to a lawful arrest. An order conforming to this opinion shall be issued concurrently herewith.